THE LIFE ASSOCIATION OF AMERICA, plaintiff in error, *vs.* SUSANNAH M. WALLER, defendant in error.

The act of self-destruction by a person who is insane at the time, without fault on his part, is not suicide, in any proper sense, if the insanity be of such character and degree as to free the act from all immorality, and leave the actor entirely blameless.

Insurance. Suicide. Contracts. Before Judge TOMPKINS. Chatham Superior Court. February Term, 1876.

Mrs. Waller sued out an attachment against the Life Association of America, based on a policy of insurance on the life of her husband, A. R. Waller.

On the trial, the evidence made, in brief, the following case:

Waller's life was insured by defendant, for the benefit of his wife or other legal holder of the policy, in the sum of $5,000 00. One of the conditions of the policy was that "if the insured shall die by suicide during the continuance of this policy, said Life Association will pay to the legal holder of this policy its net present value at the date of such death, as computed by the American Experience Table of Mortality, and four and one-half per cent. interest." On May 31st, 1875, he died by his own hand, shooting himself in the head with a pistol. In the opinion of witnesses, who knew him well and saw him frequently just before his death, he was insane at that time. The evidences of insanity were numerous; he was alternately melancholy, excited and abstracted; would interrupt conversations by complaints of his troubles, his failure in planting and his disgrace, though, in fact, his planting was generally successful, his financial condition prosperous, and his social and business relations pleasant. Sometimes he seemed unconscious of the presence of others. He frequently said that he was in great pain and could not live long. Two or three weeks before his death, he sent for a friend, stated his expectation of death and asked that the latter would assist his wife in winding up his affairs, though he seemed in no danger. In the course of the conversation,

he said that he had dyspepsia, but the real trouble was "here," (touching his head) and that there was something wrong on his mind; afterwards he burst into tears without apparent cause. Twice in conversation, when the subject of self-destruction was mentioned, he expressed his abhorrence of it; one of these conversations was within an hour of his death. From Saturday, May 29th, to Monday the 31st, he seemed much disturbed, scarcely ate or slept, was very restless and melancholy. On Saturday night he became frightened by a note which he had received from his employer in regard to one of the plantations which he was managing, had his buggy brought out, and in company with a friend started at a furious pace to the plantation. On the road he changed his mind, and returned home with equal speed. Next morning this friend and another (both being at Waller's house) were discussing the state of his mind and the necessity of having him watched, when he came into the room, and dropped into a chair, saying, "My God! I cannot stand this thing; it will kill me." Soon after, in company with one of these parties, he drove to the plantation several miles distant, making an appointment to meet the other the same evening. On the road he expressed to his companion the belief that it would be his last ride. The latter said that he saw no reason why it should be so, unless Waller died by his own hand. He thereupon said that would never be. In less than an hour after, they arrived at the plantation; Waller lay down on a bed; his companion left him for a moment, heard a pistol-shot, returned and found Waller with a pistol in his hand, and shot through the head. His physician testified that he was subject to malarial fever and dyspepsia, and that the latter disease may produce insanity.

Evidence was also introduced to show that the net value of the policy, computed by the American Experience Table, was $109 62.

The jury found for the plaintiff $5,000 00. Defendant moved for a new trial on the following, among other grounds:

1st. Because the verdict was contrary to law and evidence.

2d. Because the court admitted evidence of Waller's insanity.

3d. Because the court charged that "if the jury find from the evidence that A. R. Waller died by his own hand while in a fit of insanity, they must find for the plaintiff in the amount of the policy."

The motion was overruled, and defendant excepted.

JACKSON, LAWTON & BASSINGER, for plaintiff in error.

WEST & CUNNINGHAM, for defendant.

BLECKLEY, Judge.

The Code (section 2822) and the contract alike declare that suicide shall make the policy void. What is suicide? The meaning of a word depends less upon a derivation than upon usage. The former indicates what, according to sound scholarship, the word ought to mean, but the latter determines more directly what it does mean. A word may be more comprehensive or less comprehensive than the term or terms from which it was derived. It may drop attributes which they included, or grasp some which they did not include. Again, many words are used, sometimes in a proper, and at other times in an improper sense, both of them well sanctioned by custom. Thus, we say that an idiot cannot make a will; and that the will of an idiot is void. In the first of these propositions, the word *will* includes all the attributes requisite to validity; in the second it does not, for otherwise the so-called will could not be void. A will in the latter sense is no will in the former. A somewhat similar diversity exists in the use of the word suicide; and hence it is almost, if not quite, an allowable expression to say, that the suicide of A was not suicide The real question is, which is the proper, and which is the improper sense of the term? Johnson's dictionary defines it thus: "Self-murder, the horrid crime of destroying one's life." Walker's dictionary gives exactly the same definition. Webster's dictionary defines it thus: "The act of

designedly destroying one's own life, committed by a person of years of discretion, and of sound mind; self-murder." The Encyclopædia Britannica calls suicide "The crime of self-murder." The Encyclopædia Americana, under the word homicide, says: "The act of suicide is considered by the law to be murder, and the person making away with himself is accordingly styled a self-murderer." Lord Coke says, "If a man lose his memory by the rage of sickness or infirmity, and kill himself while he is not *compos mentis,* he is not *felo de se;* for, as he cannot commit murder upon another, so in that case he cannot commit murder upon himself:" 3 Inst., 54. Lord Hale says: "*Felo de se* or *suicide* is, where a man of the age of discretion, and *compos mentis,* voluntarily kills himself:" Hale's Pleas of the Crown, 411. Blackstone says: "A *felo de se,* therefore, is he that deliberately puts an end to his own existence, or commits any unlawful, malicious act, the consequence of which is his own death. * * The party must be of years of discretion, and in his senses, else it is no crime:" 4 Com., 189.

What we have quoted furnishes strong evidence that suicide, proper, both in ordinary and legal language, is something more than self-sought and self-inflicted death. It is a species of crime or wickedness—something wrong; a kind of self-murder. An insane man forms the purpose of making his last will. He provides himself with proper materials for writing, and deliberately commits his testamentary scheme to paper ; signs and seals it in the presence of witnesses, and has it duly attested. He has done what he desired and designed to do, and, in this sense, has acted voluntarily ; but what is the result? He has a document, a so-called will, but no real will. Being without testamentary capacity, what he has executed is no more his will than it is that of the pen with which it was written. Let it be supposed that the unfortunate man is so far gone in mental derangement that he has lost the power of distinguishing right and wrong, and of electing between them in conduct. While his moral agency is thus suspended, he conceives the design that, as he has disposed of his property by

will, he will dispose of his life by suicide. He selects a fit instrument for his purpose, and uses it fitly, just as he did in respect to the materials for writing. Though by reason of his malady he knows nothing of good and evil, he can still apply the law of cause and effect. He remembers that a loaded pistol may be discharged by pulling the trigger, and that a bullet in the brain will produce death. With a distinct purpose to kill himself, a purpose as easily formed, perhaps, in particular cases of insanity, as the intention to take food or drink, nay, in some cases it may be impossible not to form it, he fires the fatal shot and dies. · The result is a so-called suicide, but not a real one. The physical properties are all present, but the essential moral property is absent. The solemn writing—the signing, sealing and attestation are complete, but there is no will. It might as well be decided that the pistol murdered the man, as that he committed " self-murder, the horrid crime of destroying one's life."

In suicide, proper, there must be a moral element, and the presence of that depends upon whether the man is so far rational as to be able to discern the difference between right and wrong. If, from disease or misfortune, he is so utterly irrational as to be equally innocent with or without attempting the forbidden violence, he is not a moral agent, and his act is that of a mere animal that has lost the instinct of self-preservation. Would it be suicide for a sleeper to dream of death, to desire, in his dream, to die, and to gratify the desire by carefully, while still asleep, selecting and applying appropriate means for the destruction of life? In insanity, the reason sleeps while the body wakes ; and the reason is the man.

We are aware that there is a strong current of modern decision, both English and American, against applying any moral test whatever to cases of alleged suicide, in the law of life insurance. But we believe that the true doctrine was announced by the Supreme Court of the United States, in Life Insurance Company vs. Terry, 15 Wall., 580. See, also, 8 New York, 299; 7 Heiskell, 567; 26 La. An., 404; 55 Georgia Reports, 103; 41 Ibid., 338.

The law of the main question being as above indicated, the verdict of the jury was what it ought to have been under such convincing evidence as the record contains. This view controls the case, and ends it.

Judgment affirmed.