2857.  FRATERNAL RELIEF ASSOCIATION *v.* EDWARDS.

1. While, under the law of this State, suicide releases an insurance company from liability under a policy issued upon the life of the suicide, still not every act of self-destruction is suicide within the purview of this rule. Legally speaking, for a person to kill himself as the result of insanity is not suicide.

2. A policy of life-insurance is not rendered void because the risk of the insured's killing himself while sane is not excepted therein. Even though the courts would refuse to enforce liability if the insured, being sane, killed himself. the policy would be enforceable if the death of the insured were otherwise occasioned. Whether an insurance company can lawfully contract that a policy shall be incontestable as against the defense of the insured person's voluntary self-destruction while sane is not decided, as the case can be fully and properly decided without reference to that question.

3. Where a case, as fully and properly viewed, necessarily turns on a single question of fact, and the trial court properly presents that question to the jury as the sole matter in issue for their determination, and the jury render a verdict which, by necessary implication, adopts one of the conflicting theories of fact involved in this controlling question, and the verdict is supported by evidence, a new trial will not be granted, though the trial judge may have reached this view of the case (which, as has been stated, was the proper view) through a series of erroneous rulings upon the principles of law governing the case.

4. It is lawful for a fraternal relief association or similar order to provide in its certificates or policies of insurance issued to its members that the contract shall be subject to the future as well as to the present laws, by-laws, or regulations of the order as adopted by the legislative or governing body of the order; and such conditions or stipulations are enforceable. However, though such an association has expressly reserved the right to modify its existing contracts by legislation from time to time to be adopted, still it is a rule of construction that all laws, by-laws, and regulations are to be considered as having reference to future contracts only, unless the intention to affect pre-existing contracts is clearly and undoubtedly expressed.

5. Generally speaking, it is not necessary for the minutes of the legislative body of a corporation to show the vote by which a matter coming before it was adopted. A recital that the matter was adopted is generally sufficient. But, where in a legislative body a vote of more than a majority of a quorum is necessary to the passage of any law, the passage of a law can not be shown by proving merely that the proposed law was referred to a committee which reported favorably to its passage, and that the report of the committee was adopted. In general parliamentary practice the favorable report of a committee upon a matter of proposed legislation can be adopted by the vote of a simple majority of those voting. This merely gives the proposed legislation such parliamentary status as authorizes its being put on its passage; and it is not to be considered as adopted until it has been put on its passage, and has received the vote required for the passage of laws.

6. Before the books of a corporation are admissible in evidence in favor of the corporation, their authenticity must be shown. In mutual and fraternal benefit associations and in similar orders the relations of the corporation to its members, especially where a right is asserted by the corporation against a member, can be shown only by the official records properly authenticated, except in cases where, upon a showing as to the loss or inaccessibility of the original records, secondary evidence is admissible.

7. The secretary, or other person performing the duties of secretary, is usually the proper custodian of the minutes and official records of a corporation, and he is generally the proper person by whom to prove their authenticity.

8. Where a case is on trial between a fraternal association and one of its members (or his representative or the beneficiary under one of its certificates), and the association attempts to affect the rights of the member by the assertion of a by-law binding on him, and, to prove the by-law, offers what purports to be the minutes of its legislative body, and offers the president of the association to prove the authenticity of the minutes, and it appears that the material and controlling thing on the minutes, so far as the rights of the particular member are concerned, is found in an interlineation which does not appear in the handwriting of the secretary and which the president, as a witness, says he can not explain, the court properly rejects the record from evidence, especially where the president, as a witness, admits a belief that the interlineation was inserted into the minutes after the death of the member.

9. "The production of the paper by the opposite party (if he claims any benefit under it) dispenses with the necessity of proof, and the notice to produce dispenses with proof as against the party giving the notice." However, production under notice does not affect the right of the party against whom the paper is offered to object to its introduction in evidence on account of irrelevancy, or because of its secondary nature.

DECIDED FEBRUARY 22, 1911.

Action on insurance policy; from city court of Macon—Judge Hodges. November 27, 1910.

*John R. L. Smith,* for plaintiff in error.

*Ryals, Grace & Anderson,* contra.

POWELL, J. Mrs. Edwards, as the beneficiary in a policy of fraternal life-insurance issued by the Fraternal Relief Association, a corporation of the State of Virginia, brought suit against the association for $2,000, which, under the policy, was to be paid upon the death of her husband, James B. Edwards, who was a member of the association. It will not be necessary to state all the facts. The following will be sufficient: The policy was issued in 1903. It was expressly provided that "the constitution and laws of the Fraternal Relief Association now in force, or, as the same may be hereafter altered or amended, . . shall constitute the contract" between the parties. At the time the contract was made, section 19 of the laws of the Fraternal Relief Association provided: "If any member dies . by self-destruction, whether sane or insane, . . the beneficiary certificate, together with all claims by reason of membership, shall be null and void; but the executive committee, in their discretion, if they consider that the circumstances surrounding such death warrant it, may, without prejudice, pay any sum in such case, not exceeding the full amount: provided, however, that in case of suicide of a member who has been a member in good standing for five years, the full amount of his certificate shall be paid." On February 13, 1909 (which, as may be seen, was more than five years after the date of the making of the contract), Edwards, while in good standing, killed himself. While the plaintiff concedes that the death of the insured was the result of self-destruction, she claimed that he was insane at the time, and introduced enough evidence to authorize the jury to find that such was the case. The trial judge, under the conceded facts, practically limited the jury to a finding whether the insured was sane or insane at the time he killed himself, as he charged the jury ex-

plicitly that the issue for them to determine was whether the insured at the time when he killed himself was sane or insane, and that if he was sane, the verdict should be for the defendant, and if insane, it should be for the plaintiff. He further instructed them as to what was meant by sanity and insanity in this context; and his instructions on this subject were clearly correct, if the case is one falling under the general rule that the self-destruction of an insane man is not legal suicide. The jury found for the plaintiff under this charge, and therefore the verdict is necessarily to be construed as finding that the insured was insane at the time of his death. We think that the case, under the evidence admitted by the court, turned solely upon this issue.

1-3. We need not bother with the question whether an insurance company can make a contract enforceable in this State, whereby it undertakes to insure a man against his voluntary self-destruction. For the purpose of the decision, we may concede the contention of counsel for the plaintiff in error that the public policy of this State, as expressed in Civil Code (1910), § 2500, that "death by suicide, or by the hands of justice, either punitive or preventive, releases the insurer from the obligation of his contract," is such as to prevent an insurance company from expressly agreeing that a policy shall be incontestable as to suicide voluntarily and sanely committed, though there is much argument and authority to support the view that, especially as to contracts of insurance payable otherwise than to the personal representatives of the insured, such an agreement as to incontestability might be upheld. It is well settled that this section of the code relates only to the self-destruction of a sane man; that in legal contemplation, for an insane man to kill himself as a result of his insanity is not for him to commit suicide. The legal meaning of the word "suicide" is not so broad as is its colloquial use, which neglects the distinction between the self-destruction of a sane man and the self-destruction of an insane man. The rule is announced by Judge Bleckley, speaking for the court, in the case of *Life Association of America* v. *Waller, 57 Ga.* 533: "The act of self-destruction by a person who is insane at the time, without fault on his part, is not suicide, in any proper sense, if the insanity be of such character and degree as to free the act from all immorality, and leave the actor entirely blameless." There is nothing in the law or public policy of this State which prevents

an insurance company from insuring a person against death from self-destruction resulting from such insanity as is referred to in the case just mentioned. An examination of the statutes and decisions of the State of Virginia, by the laws of which the parties agreed that the contract should be construed, shows that the same rule prevails in that State.

The court below construed the proviso found at the end of section 19 of the general laws of the Fraternal Relief Association, as quoted above ("in case of suicide of a member who has been a member in good standing for five years, the full amount of his certificate shall be paid"), as being a provision for the payment of the policy in case of suicide, whether the self-destruction was committed while the insured was sane or insane, and, taking the view that a provision of insurance against suicide, sanely committed, was contrary to public policy of the State, held that the entire section 19 was unenforceable in this State, and that, therefore, the case should be tried as if this provision did not exist; that is, under the general law of this State. It was on this theory that the court charged the jury that if the insured was sane at the time he killed himself, the plaintiff could not recover, and that if he was insane, the plaintiff should recover. We do not so construe the section. We think that this proviso was intended, and is to be construed, as insuring only against suicide in the legal sense of the word. But if we are mistaken as to this, and if the correct view is that this is a provision to pay the amount of the policy in the event of self-destruction, irrespective of the sanity or insanity of the insured, and that it is contrary to the public policy of the State for an insurance company to agree to pay insurance where the insured comes to his death as a result of self-destruction while sane, we think that the proper way to deal with the section would be to construe it as valid, but subject to an exception to be implied if there were an attempt to enforce it in a case where the insured did sanely kill himself. For instance, if an insurance policy said nothing at all as to the manner of the death of the insured, but merely said that upon the death of the insured the insurer would pay the beneficiary the named amount, the policy would be valid, generally speaking, but would be subject to defense, on the ground that, so far as its terms included death by sane self-destruction, it was contrary to public policy, and could not be enforced. But this construction of this section of the general

laws of the relief association merely brings us to the same common point with the court below, namely, that the plaintiff should recover if the insured was insane at the time he killed himself, and should not recover if he was sane. So that, while the trial court's construction of this section of the relief association's laws may have been incorrect, he submitted the case to the jury on what was a proper basis. We recall what Judge Bleckley said (in *Lee* v. *Porter,* 63 *Ga.* 346) as to a similar instance:

"The pupil of impulse, it forc'd him along,

His conduct was right, with his argument wrong;

Still aiming at honor, yet fearing to roam,

The coachman was tipsy, the chariot drove home."

So that, unless the court committed some error in the exclusion of the testimony to which we are about to refer, the judgment refusing a new trial should be affirmed.

4. What has been said above is based upon the evidence presented to the jury; but what are probably the closest questions in the case, as presented in this court, are involved in the exceptions to the rulings of the court in excluding evidence offered by the relief association, tending to show that, while section 19 of its general laws existed in the form in which it is set out above at the time that Edwards became a member in 1903, this section was subsequently so changed that there could be no recovery upon the policy held by a member who committed self-destruction, irrespective of whether he was sane or insane at the time. It will be remembered that the policy, or certificate as it is called, provided that it was to be subject to the constitution and laws of the relief association, not only as they existed at the time of its issuance, but as they might from time to time be amended. In order that what is about to be held on this subject may be more fully understood, we will first announce the proposition that by-laws enacted by fraternal insurance orders will, in the absence of a clearly expressed intention to the contrary, be construed to have only a prospective operation. While a member in making a contract may agree with the corporation that he will be bound by the constitution and by-laws of the organization existing at the time the agreement is made, and any law that may thereafter be legally adopted, he is entitled to rely upon the contract and conditions as made until the law-making power of the organization enacts legislation which by its terms ap-

plies to his contract; and, by a familiar and very generally recognized rule of construction, a by-law subsequently enacted will not be construed as intended to apply to such a previous contract, unless its intention that it should have a retrospective operation is clearly manifested; or, as is sometimes said, the intention that they should operate retrospectively never exists by mere implication, and the language used must be "clear and undoubted." *Sovereign Camp* v. *Thornton,* 115 *Ga.* 798 (42 S. E. 236), and citations. This is undoubtedly the rule of construction in this State, and we understand it to be the rule in Virginia and very generally in all the States where the local jurisprudence is based on the common law. It is a rule of construction rather than a rule of substantive law. So that, before the defendant association in this case could successfully show that section 19 had been modified so as to affect the plaintiff's rights, it would have to show by legal evidence that there had been legally enacted a change in this law, and that the change, by express language, had been given a retrospective operation.

5. To show that the laws of the association had been so changed as to make the contract sued on voidable by suicide of the insured, the defendant offered what it asserted were the minutes of the lawmaking body of the association. The constitution provided: "This constitution and the laws governing the association, and the uniform constitution for the government of its lodges, shall not be altered or amended except by three-fourths vote of the members present at a regular meeting, or a special meeting called for the purpose; and all proposed amendments must be presented in writing, signed by three or more representatives, and referred to a special committee on laws, who will report thereon before a vote is taken on any such proposed amendment or amendments." From what purported to be the minutes of the first triennial meeting of the association, held in 1905, the following proceedings appear to have been had: A proposal was made by five representatives as to a large number of proposed amendments, one of which had the effect of striking from section 19 of the general laws the provision as to paying death claim where the suicide occurred after the policy had been in force five years or more. These amendments were referred to the committee on laws, who reported that they had examined the same and recommended their adoption. The minutes recited that the report of this committee "was adopted."

For at least two good reasons (though other reasons are asserted) the court did not err in excluding this evidence. In the first place, the amendment did not clearly and undoubtedly express the intention that it should operate retrospectively; hence, it did not apply to the contract before the court, as the contract had been made prior to 1903. Counsel for the plaintiff in error contend that a retrospective operation was given to this amendment, because at the same time another amendment was adopted which provided that "No member of this association or any subordinate lodge or any of its officers or members shall have the power or authority to waive any of the provisions of the constitution and laws of this association, and the same shall be binding on the association and each and every member thereof." This merely states what we have recognized to be the rule, that in contracts of this kind the constitution and laws of the association are binding on the association and on each and every member thereof, but this does not affect the proposition that the constitution and laws, though binding, do not have such a retrospective operation as to change previously existing contracts, unless the intention to change them is clear and undoubted. Another reason why these proceedings were properly excluded is that the adoption of the change in the laws does not appear ever to have been made in accordance with the constitution. The constitution required the adoption of the change by a three fourths vote. Nowhere do the minutes say that this amendment was adopted. The nearest approach to saying that the amendment was adopted is where it is stated that the committee on laws recommended the adoption, and that the report of the committee was adopted. We recognize the rule that where it is stated that certain action was officially taken by a corporate body, it is not necessary for the minutes to state the vote by which the body acted, unless there is some law in force requiring the setting out of the vote. If the minutes in the present case had said that these amendments were adopted, we would presume, until the contrary appeared, that they had been put to a vote before the legislative body of the association in regular manner, and that three fourths of the representatives had voted in favor of them. But the minutes do not say that the change in the law was adopted, but say that the report of the committee was adopted. The usual procedure in parliamentary bodies where the vote of more than a majority of those pres-

ent and voting is necessary to the passage of a particular law or resolution, and a matter so required to be passed has been referred to a committee which has reported favorably to its passage, is for the body first to take a vote upon agreeing to the report of the committee, and if a majority of those voting on the motion to adopt the report of the committee vote in the affirmative, the report of the committee is adopted, though the number so voting is less than the number adequate to the passage of the law, bill, or resolution, as the case may be, and the matter remains before the body for its further action. But if on the vote to adopt the report of the committee the majority votes in the negative, the matter, unless reconsidered, is killed; for if the bare majority of those voting, which is adequate to adopt the report of the committee, can not be obtained, it is unnecessary to burden the legislative body further with the matter in the attempt to get the greater affirmative vote required for the passage of the measure. For instance, in the General Assembly of this State, it very frequently happens that where a bill is favorably reported, the report of the committee is adopted, but when the bill is immediately thereafter put upon its passage, it fails to get the required constitutional majority; and, on the other hand, if the favorable report of the committee is disagreed to on this preliminary vote, the bill is regarded as dead, unless, of course, the matter is duly reconsidered. Hence, since the minutes offered in this instance merely recited that the resolution seeking to change section 19 of the general laws was referred to the committee, and that the committee reported favorably and the report of the committee was adopted, they did not show that the proposed amendment was ever adopted by the three-fourths vote required by the constitution of the association.

6. The defendant also offered in evidence what it claimed to be the original book of minutes of the second triennial meeting of the association, held in 1908. According to these minutes, an amendment to section 19 was legally and regularly adopted, by which, even if this proviso as to paying death benefit on a certificate where the insured had committed suicide after five years had not been eliminated previously, it was then stricken out. While the amendment did not on its very face purport to be retrospective in its operation, in the recitals of the minute book as offered was found the statement (which immediately followed the statement

on the minutes that the amendment was adopted) : "By a unanimous vote it was ordered that all of said *amendments and additions to said constitution and general laws shall apply to all members of the association, whether hitherto or hereafter* admitted to membership." (Certain portions of this extract from the minutes are italicized to show just where the interpolation or alteration asserted, and referred to hereafter, appears). We doubt that even this is sufficient to show that "clear and undoubted" intention to affect pre-existing contracts which is necessary to give these amendments a full retroactive effect; for it must be remembered that the amendments and additions to the constitution and general laws might be made to apply to all the members of the association, irrespective of the date of admission, so far as their future dealings with the association might be concerned, without affecting the contractual rights which had been previously entered into. It must be kept in mind that we are dealing with a subject requiring strict proof of a certain, specific intention before that intention is to be considered as existing. While these associations may write into their contracts and enforce as a part thereof a provision that the governing body of the association shall have the right so to change the contract as to deprive the member and the beneficiary of rights which otherwise would have become such vested contractual rights as not to be subject to impairment, still the very relationship of the parties, the very nature of the subject-matter, the great degree of confidence thus reposed by the members in the governing body is such as to carry with it the strongest implication that the governing body will not lightly attempt to interfere with the pre-existing contractual status of the association and its policy-holders. To allow a member to contribute to an insurance fund through the payment of his regular dues and assessments thereto for a number of years, toward the acquirement and perfecting of a policy which will give him certain definite insurance benefits, and then to change that policy without his consent, so as to deprive him of those benefits, is a power which the governing board of an association, under the strict good faith expected in such cases, should not exercise, in the absence of the strongest necessity for their so doing. To pass a law which shall leave existing contracts unaffected, but which shall apply to future contracts, is a natural and reasonable function of such a governing body. Therefore it is never to be presumed

that the governing body intends to interfere with existing contractual rights of the members when it proposes laws or regulations. The old members as well as members who expect to join thereafter may be included within the purview of the law without affecting the status of the existing contracts previously entered into with the old members. Hence, we strongly lean to the view that the language used in this case, which simply says that these amendments to the laws shall apply to all members of the association (whether heretofore or hereafter admitted), does not have the effect of saying that the contractual rights of the old members, as theretofore existing, shall be accordingly abrogated.

However, in the case before us we do not find it necessary to say that the court would have' been authorized to exclude evidence of this change in the laws of the 'association on the ground that the change was not applicable to the certificate involved in the present case, in order to uphold the ruling of the court in excluding the evidence. Before the books of a corporation are admissible in evidence in favor of the corporation, it is necessary to prove the authenticity of the books. "In mutual benefit societies and orders the relation of the corporation to a member [especially when any right is asserted by the association against a member] can be shown only by the records." 2 Thompson on Corporations (2d ed.), § 1850. "Before the records of a corporation are admissible in evidence for any purpose, or on any theory, it must be made to appear, prima facie at least, that they are the books of the corporation, and that they have been kept as such, and that the entries therein were made by the proper acting officer. Such books do not generally prove themselves, and do not carry within themselves intrinsic evidence of their own authenticity." Id. § 1852.

7. The secretary or the person performing the duties of the secretary is usually the proper custodian of the minutes of the corporation, and therefore is usually the proper person to make the proof as to the authenticity of the records. *Lowry National Bank* v. *Fickett*, 122 *Ga.* 489 (50 S. E. 396) ; *City of Columbus* v. *Ogletree*, 102 *Ga.* 293 (29 S. E. 749) ; *Merchants' Bank* v. *Rawls*, 7 *Ga.* 191 (50 Am. Dec. 394).

8. The technical objection exists against the consideration of the exceptions contained in the motion for new trial, as to the exclusion of this evidence, that in them the evidence submitted to the

court is not set out sufficiently to make out that prima facie case of authenticity essential to the admission of any document in evidence, but they merely refer to the testimony of a witness (as contained in the brief of the evidence). As held in *Arnold* v. *Adams*, 4 *Ga. App.* 56 (60 S. E. 815), following *Kelly* v. *Kauffman Co.*, 92 *Ga.* 105 (18 S. E. 363), the exception is not properly presented. But, aside from this, it appears that the secretary of the association was not produced or accounted for. The defendant attempted to identify and authenticate the minutes by the testimony of its president. The very material matter referred to above as being contained in the minutes of the proceedings of 1908, and specially indicated by the use of italics, appeared as an interlineation upon the book offered as the book of minutes. The president stated that he did not know when the erasure and change was made, that the secretary had signed the minutes as originally written, but that this interlineation was not in his handwriting, and, while the witness was unable to state when the change was made, he stated that he did not think that these words containing the interlineation appeared on the minutes at the time the insured in the present case died. Without this matter which was contained in the interlineation, the minutes showing the change in the by-laws, even if otherwise authenticated and admissible, should have been excluded, on the theory that they were irrelevant; that is, that the change in the law, not being retrospective, did not apply to the contract in question. Therefore the most essential thing toward giving this document evidentiary standing in the case was contained in an unexplained alteration, which even the witness who was produced to authenticate the minutes (himself the chief officer of the corporation) believed had not been made a matter of record until after the death of the insured in this case. In the language of Thompson on Corporations (2d ed.), § 1850: "The rule is that the attitude of a corporation toward its members can only be known through its action as a corporate body; and the only proper evidence of such action must be the records or proceedings of the organization itself. In mutual benefit societies and orders the relation of the corporation to a member can be shown only by the records." Of course, this statement carries with it the implied exception that there are times when, after satisfactory accounting for the loss or destruction of the original records, secondary evidence

may be resorted to.   Another rule stated by Thompson is (§ 1852) that: "Where the corporation itself relies upon its own records, strict proof of their authenticity is required." The preliminary showing in such cases is addressed to the court, and frequently the discretion imposed upon the court in this preliminary showing is largely controlled by ocular inspection of the document offered, taken in connection with such explanation as the party submitting the document may offer.   While, as a general rule, the authenticity of every document offered in evidence is a question for the jury, still, if the preliminary showing fails to make at least a prima facie case of authenticity, the judge has the discretion of excluding the document from evidence.   And, irrespective of all technical objection, we are unwilling to say that under the showing made in this case the court erred in excluding this document.

9. Counsel for the plaintiff in error contend that proof of the authenticity of the record was waived in the present case, because the document was produced under statutory notice.   This statement of fact, so far as this document is concerned, is not verified by the approved recitals of the motion for new trial.   However, there is an objection in the record that the court refused to allow the defendant to put in evidence the original resolutions, references, and reports of committee, together with the memoranda of·· passage applying thereto, from which it is alleged that the minutes were made up, and it is stated as to this that notice to produce had been served, requiring the defendant to produce "all amendments to the constitution and general laws of the defendant association," and that this paper was produced under that notice. As a general rule, notice to produce operates to relieve both parties to the case from the preliminary proof of the authenticity of the document which has been made the subject-matter of the notice. Or, as it is stated in the Civil Code (1910), § 5832, "The production of the paper by the opposite party (if he claims any benefit under it) dispenses with the necessity of proof, and the notice to produce dispenses with proof as against the party giving the notice."   It is probably upon this legal consequence that the rule is based which requires that notice to produce shall distinctly describe the documents.   The party upon whom the notice is served can not claim this quasi discovery as to a document not included within the terms of the notice.   We doubt that these memoranda are the

specific matter referred to in the notice. Be that as it may, notice to produce does not waive the right to object on account of irrelevancy, or on account of the fact that the evidence produced is secondary. At most, this paper could have been used only as secondary evidence, after the primary had been properly accounted for. In the first place, the president was not the proper person to account for the absence of the original minutes, or for the alteration appearing in them, unless he had personal knowledge of the facts and the secretary did not; and in this case the converse is true. As we have already said, proper record was essential to charge the member.

We conclude, therefore, that the court did not err in excluding the testimony by which the defendant attempted to show that its laws had been so changed as to prevent the plaintiff's relying upon the law in force at the time the contract was made. Under our construction of that law, the plaintiff was entitled to recover, unless her husband killed himself while sane. The trial court, though giving a somewhat different construction to the section of the general laws of the association upon which this question arises, nevertheless reached the same result and submitted this identical issue to the jury, and their verdict is by necessary implication to be taken as a finding of fact that the insured killed himself at a time when he was insane, and not morally responsible for his act. The evidence fully authorized this finding of the jury. Abstract errors of the court are to be disregarded. The case was tried with all practical fairness to the defendant, and the defendant has failed to show any harmful error. Consequently the judgment is

*Affirmed. Russell, J., disqualified.*