CHRISTENSEN *v.* NEW ENGLAND MUTUAL LIFE INSURANCE COMPANY.

No. 14790.   MAY 9, 1944.   REHEARING DENIED JUNE 9, 1944.

*Scott, Dunaway, Riley & Wiggins,* for plaintiff.

*Jones, Williams & Dorsey,* for defendant.

BELL, Chief Justice.   The Court of Appeals certified the following questions:   "Where a life insurance policy provides as follows: 'Suicide.   If the insured, whether sane or insane, shall die by his own hand or act within two years from the date of issue of this policy, the liability of the company under this policy shall be limited to the payment in one sum of the amount of premiums paid, less any indebtedness to the company.'   Is the company liable for the face amount of the policy, where it would be liable therefor unless the above quoted provision became applicable, where the insured, within two years from the date of the issue of the policy, comes to his death by jumping from a sixth story window of a hotel and landing on the roof of another part of the hotel forty-three and one-half feet below, when the insured, by reason of an hallucination, jumped to escape injury from imaginary enemies and did not realize that his act would as a natural consequence produce his death?"

It is declared in the Code, § 56-909, that death by suicide shall release the insurer from his contract; but the defense of suicide can not be based solely upon this provision, where the act of the insured in taking his life was the result of his own insanity, for such an act would not be suicide within the meaning of *this law. Merritt* v. *Cotton States Life Ins. Co.,* 55 Ga. 103 (6) ; *Life Association of America* v. *Waller,* 57 Ga. 533; *Fraternal Relief Association* v. *Edwards,* 9 Ga. App. 43 (70 S. E. 265).   However, such defense as to an insured who is sane may be waived, and the effect of the clause here was to waive it after two years.   *Mutual Life Ins. Co.* v. *Durden,* 9 Ga. App. 797 (6, 12) (72 S. E. 295).

But the clause was not merely a waiver in favor of the insured, for, instead of simply retaining the defense of suicide as to a sane insured for the first two years, it actually sought to enlarge such defense so as to include therein the act of self-destruction by an insane person, during such period.   The clause in this respect was defensive in nature, and it is this phase of it that is here for determination.   Accordingly, for present purposes, the clause must

be viewed and dealt with as a defensive one. It embraced suicide, "whether sane or insane," and in the particular case, as stated in the question, the insured came to his death by jumping from a sixth story window of a hotel, when by reason of an hallucination he was endeavoring to escape from imaginary enemies and did not realize that his act would as a material consequence produce his death.

The question turns chiefly upon the meaning of the phrase, "whether sane or insane," as inserted in such a clause, for it is generally held that the words, "who shall die by his own hand or act," are nothing more than a proviso against suicide or intentional self-destruction. *Equitable Life Assurance Society* v. *Paterson,* 41 *Ga.* 338 (4) (5 Am. R. 535) ; 29 Am. Jur. 699, § 918. Formerly, stipulations against suicide, minus the words "sane or insane," were in use, and under such stipulations the courts generally took the view that self-destruction would constitute a defense only when the insured was sane, upon the theory that self-destruction by an insane person could not properly be classed as suicide, if the insanity was of such character and degree as to free the act from all immorality and leave the actor blameless. For example, see *Life Association of America* v. *Waller,* supra. In other words, that such a clause, though waiving the defense of suicide after a stated period, did not enlarge it in any manner, as it already existed under the law, during such period. After decisions to this effect, insurance companies began to insert the phrase, "whether sane or insane," or similar words, and the question then arose as to the legal effect of such interpolation. Upon one phase of this question, a decided conflict of authority soon developed, and still exists. While it is generally agreed that the additional words served to extend the suicide clause to *intentional* self-destruction by an insane as well as by a sane person, regardless of the moral or criminal quality of the act, the authorities are in sharp conflict on whether intention of the insured to take his life is essential to such defense where, because of his insanity, he did not realize the physical nature and consequences of his act as one that would produce death, and therefore committed it without even an insane purpose or intention to take his life, the "numerical weight of authority" being to the effect that the element of intention is not essential to the defense in such a case. 29 Am. Jur. 700, 701, §§ 920, 921.

One of the earliest cases in which the question arose was De Gogorza v. Knickerbocker Life Ins. Co. (1875), 65 N. Y. 232, decided by the Commissioners of Appeals of New York, and not by the Court of Appeals, as is sometimes mistakenly stated; although the rank of the tribunal would be of no importance, provided the decision is sound. It was held in effect that actual intention was unnecessary to the defense where the act producing death was of such nature that it would be treated as suicide if it had been committed by a sane person, although the insured, because of insanity, did not realize the physical nature and consequences of his act, and therefore had no actual intention, sane or insane, to take his life. The commissioners were divided, however, three concurring and two dissenting. Able opinions were written, and from that time forward the same diversity of opinion has constantly appeared, a majority of the courts agreeing with the prevailing view, and others following the dissent. It may be observed further, that even in the later cases, dissenting opinions have frequently been filed, and the two lines of opinion have generally tracked pretty closely the reasoning contained in the opposing views expressed in that case. In that case, it appeared that the insured had some disease of his brain which seriously affected his mind, and on the day of his death, he was found in his room, in his own house, a pistol having been discharged, by his own hand, into his mouth. The pistol belonged to his son, and there was no evidence that he knew it was loaded, and there was no evidence of the circumstances of his death, except what appeared when he was discovered dead. The majority opinion stated that a verdict for the plaintiff having been rendered, the court would assume that the jury found that when the hand of the insured dealt the fatal shot, he was wholly bereft of reason. In holding that the clause, "die by his own hand or act, sane or insane," applied as a defense, even though the insured was so insane that his act of self-destruction was wholly involuntary, it was said: "That this language [sane or insane], in view of previous decisions, was inserted for such a purpose [to exempt from liability], can not be doubted, and that it was agreed to by both the insured and the insurer is not questioned, and that it is a provision allowed by law, no one denies. We are to say from these words what the parties must have intended, and we can not properly say that additional words having no meaning were

inserted in the contract, and if they mean anything, it is just what the words commonly import, and that is, if death ensues from any physical movement of the hand or body of the assured, proceeding from a partial or total eclipse of the mind, the insurer may go free. We are not altogether unmindful of the force of the proposition that a man does not die by his own hand who has not sufficient mind to will his own death, and it is not, perhaps, entirely easy to see in what precise words in our language the idea may be accurately and artistically expressed that a totally insane man may take his own life. But the question seems to involve more —the refinement of language—than the application of common sense, and we are of the opinion that in the common judgment of mankind it will be considered that, when a totally insane man blows his brains out with a pistol, he will be said to have died by his own hand within the meaning of a policy such as we now have under consideration."

In the dissenting opinion, it was said : " It is a matter of common observation that some insane persons can be influenced by motives ; that they can form intentions and act upon them, and that they can devise schemes and carry them out with great cunning and skill, and yet such persons may not be able to distinguish between right and wrong, may not be competent to bind themselves by contracts, or be legally responsible for crime. There are other insane persons who can not form intentions, are unconscious of the physical consequences of their acts, can not control their actions, and who act from irresistible impulse ; such persons can no more be said to act than an automaton. If such a person should commit self-destruction, the event might, with some propriety, be called an accident. It is no more the act of the insane person than if he had been compelled to do it by some irresistible external force. . . With the clause as written every case of voluntary intentional self-destruction is within the proviso whether the assured was sane or insane ; but the proviso does not apply to a case where the act of self-destruction was not voluntary or intentional. Such a case would properly be classified with accidents. It is conceded that this proviso, as now written, does not apply to the case of unintentional death of a sane man by his own hand, such a death being accidental. No more should it apply to an unintentional death of an insane man by his own hand. . . It is claimed that, under

the construction we have given to the words in this policy, no insurance company could use words that would shield it from liability in the case of the self-destruction of a person so insane as to be incapable of forming an intention or controlling his acts. I can not perceive the difficulty. If it should be provided that the policy should be avoided 'in case of suicide, or death of the insured resulting from insanity,' or 'in case of the self-destruction of the assured while insane, whether he was conscious of or intended the act of self-destruction or not,' or 'in case the assured shall consciously, intentionally and voluntarily take his own life, whether he was sane or insane,' I think there could be no dispute as to the meaning. If either of the first two provisos had been in this policy, the defendant would have been exempted from liability; if the last proviso had been in, the construction would have been that which I have given."

So far as this court is concerned, we think the dissenting opinion in the De Gogorza case expresses the better view as to what is the true and correct meaning of such a stipulation, and we shall answer the question before us accordingly.

A few additional observations, however, may be made. A thought which was at least implied in the majority opinion in that case has been developed in some of the later cases, to this effect, namely, that in order to sustain the position that the insurer would be liable if the insured was so insane that he did not realize the physical nature and consequences of his act, the courts would lose themselves in considering different phases of insanity, be compelled to split it into degrees, and to hold that, if he was so entirely insane as not to understand the physical consequences of his act, the proviso would be avoided, while a lesser degree of insanity would make the company liable. Compare Clarke v. Equitable Life Assurance Society, 118 Fed. 374, 377; Penn Mutual Life Ins. Co. v. Blum, 258 Fed. 901; Spruill v. Northwestern Mutual Life Ins. Co., 120 N. C. 141 (27 S. E. 39) ; Royal Circle v. Achterrath, 204 Ill. 549 (68 N. E. 492, 63 L. R. A. 452, 98 Am. St. R. 224).

We can not adopt this line of reasoning. According to this view, if the company has so drawn a stipulation that it would place upon the courts the difficult burden of deciding as between different degrees of insanity, then, instead of accepting the burden and determining the degree essential to such defense, they will

simply dispose of the case in favor of the insurer as if the degree was not material. If such difficulty would exist under the policy as written, certainly the insurer who created it should not be given complete advantage of it by having the case ended summarily in its favor.

It has been said also, in various decisions, that the clause is plain and unambiguous, and clearly excludes intention as a condition of the defense. We are inclined to agree that the stipulation is not ambiguous, but in any view as to its clarity, we think that it does not exclude such intention, where the insured by reason of his insanity does not realize the physical nature and consequences of his act, and by reason thereof takes his own life without even an insane purpose to do so. If it is ambiguous upon the point, it should be construed favorably to the insured. *Johnson* v. *Mutual Life Ins. Co.*, 154 *Ga.* 653 (115 S. E. 14).

A very brief analysis, we think, will demonstrate that the inserted words, "whether sane or insane," do not extract the element of intention—that is to say, the instant clause without these words, would, according to the authorities, clearly mean, "If the insured shall intentionally take his own life within two years from the date of this policy, the liability of the company shall be limited," and so forth. Insert the words, "whether sane or insane," without other change, and we have, "If the insured, whether sane or insane, shall intentionally take his own life within two years from the date of this policy, the liability of the company shall be limited," as stated. Clearly, therefore, the interpolation of the quoted phrase would not remove the element of intention as an essential of nonliability. Under such a clause, without the words "sane or insane," the contract would be governed by the general law as to the meaning of the term *suicide,* to wit, intentional self-destruction; and the company would be held liable as to an insured who, because of insanity, did not appreciate the moral quality of his act, upon the theory that the insured, being thus insane, could not have such intention. However, by inserting the additional words, the company by contract secured from the other party a concession that despite legal definitions an insane person for the purpose of the particular contract may have such intention, that is, at least an insane intention. After obtaining a contract to this effect, the company can not be heard to say that such an intention is unnecessary to its defense.

This does not deprive the insurer of the benefit of the stipulation, as suggested by the dissenting Justices, for it will still apply in cases where an insured purposely kills himself, even though his purpose be an insane one, and evidently there must be many cases of this character. Nor are we here opening or closing floodgates for fraud. If such gates are open, it is because of language chosen by the insurer, when it could easily have closed them by the use of clearer and perhaps fewer words. Nor were they created by the clause in question, for if they existed at all, they existed in more abundance before it was written, and it merely failed to close all of them. *Life Association of America* v. *Waller,* supra.

We are merely construing a contract to ascertain the evident intention of the parties according to the language used. The company has by its contract actually succeeded in extending the definition of suicide beyond what it would be under the law, and has thus for the two-year period materially enlarged the scope of its defense as it would otherwise exist under the general law; but it did not go far enough to exclude all intention, whether sane or insane, as a condition of defense.

If the companies had only adopted the suggestion contained in the dissenting opinion in the De Gogorza case nearly seventy years ago, as to language that would plainly exclude intention, it is a reasonable supposition that the incipient conflict of authority would immediately have vanished, and the many decisions pro and con regarding such a clause would never have been written. The judges who halted would evidently have been satisfied, and it can not be thought that the others would have changed their views, for they were already satisfied with less.

The views above expressed accord, as we think, with former decisions by this court and by the Court of Appeals. *Equitable Life Assurance Society* v. *Paterson,* supra; *Jenkins* v. *National Union,* 118 *Ga.* 587 (45 S. E. 449) ; *Bullard* v. *Metropolitan Life Ins. Co.,* 31 *Ga. App.* 641 (122 S. E. 75) ; *Freeman* v. *Metropolitan Life Ins. Co.,* 35 *Ga. App.* 770 (134 S. E. 639) ; *Supreme Forest Woodmen Circle* v. *Newsome,* 63 *Ga. App.* 550 (11 S. E. 2d, 480). See generally, in this connection, Billings *v.* Accident Ins. Co., 64 Vt. 78 (24 Atl. 656, 17 L. R. A. 89, 33 Am. St. R. 913) ; Cady *v.* Fidelity & Casualty Co., 134 Wis. 322 (113 N. W. 967, 17 L. R. A. (N. S.) 260) ; National Life Ins. Co. *v.* Watson, 194 Ky. 355 (239

S. W. 35, 35 A. L. R. 156) ; Muzenich v. Grand Carniolian Sloven-
ian Catholic Union, 154 Kan. 537 (119 Pac. 2d, 504, 138 A. L. R.
818).

We have carefully examined all of the cases cited in the briefs,
but we do not deem it necessary to make further reference to them
here, since most if not all of the cases on both sides are collected
and discussed in editorial notes following the reports of the four
decisions last-above mentioned, in L. R. A. and A. L. R. In 138
A. L. R., page 829, it was stated that only one decision supporting
the majority view had been rendered since the former annotation in
35 A. L. R., whereas the doctrine of the minority had been adopted
in several later decisions.

It appearing from the question certified that the insured, though
intending to jump, did not intend thereby to take his own life, but
by reason of an hallucination merely jumped to escape injury from
imaginary enemies, not realizing the physical nature and conse-
quences of his act, the question is answered in the affirmative.

All the Justices concur, except

Jenkins, Presiding Justice, and Wyatt, Justice, dissenting.
There can be no doubt that the cause which may have impelled an
insane insured person to commit an act which he, though insane,
must have known would result in his death has no bearing on the
fact of suicide, and therefore would not take the case outside of
the non-liability clause.

Here, however, the language of the question as propounded states
that by reason of the mental condition of the insured he was un-
aware that the act which resulted in his death was such as would
end his life. Therefore, the question is, where one laboring under
an hallucination and in order to escape an imaginary peril commits
an act which to a sane person would naturally result in his death,
but which to the insane mind would not and did not suggest the
natural consequences, but did in fact result as a natural conse-
quence in his death, does the contract provide that he, as an insane
person, is to be held accountable for the natural consequences of his
act just as though he were sane? We think that it does, else the
provision of the policy as to insanity is without effect, and the flood
gates are left wide open for fraud. Under the question propounded,
the insured did not *fall* from the sixth story window, but pur-
posely *jumped* in order to escape the consequences of an imaginary

# 816

peril. Thus, whether sane or insane, the act was still the exercise of volition, and under the terms of the policy he is held accountable for his voluntary act just as though he were sane. In other words, by solemn contract, legally entered upon, the insured, if he should become insane within two years, is held accountable for the natural consequences of any voluntary act just as if he were sane. Without the "sane or insane" clause, it might well be said that one who is insane is incapable of forming a deliberate intent to end his life, and that insanity and not reason is the impelling cause; but under the two-year "sane or insane" clause, so far as liability under this policy is concerned, he is precluded from availing himself of such an excuse, and is made responsible for the natural consequences of his voluntary act just as if he were in fact capable of forming a deliberate purpose of taking his own life and of judging the natural consequences of his voluntary act in so doing. See *Jenkins* v. *National Union*, 118 *Ga.* 587.