"Where a life insurance policy provided as follows: `Suicide. If the insured, whether sane or insane, shall die by his own hand or act within two years from the date of issue of this policy, the liability of the company under this policy shall be limited to the payment in one sum of the amount of premiums paid, less any indebtedness to the company,' and where the insured, within two years from the date of the issue of the policy, came to his death by jumping from a sixth story window of a hotel and landing on the roof of another part of the hotel forty-three and one-half feet below, when the insured, by reason of an hallucination, jumped to escape from imaginary enemies, and did not realize that his act would as a natural consequence produce his death: Held, that, under the foregoing clause, an intention, either sane, or insane, on the part of *Page 394 
the insured to take his own life would be necessary to constitute suicide as defined thereby, and no such intention appearing, the company would be liable for the face amount of the policy."
 DECIDED JULY 14, 1944.
Mrs. Gladys M. Christensen brought suit against the New England Life Insurance Company to recover on a policy by which the defendant insured the life of Walter M. Christensen, the plaintiff's husband, and agreed to pay to the plaintiff, as beneficiary, $2,000 on the death of her husband. The defendant denied liability. On the trial of the case there was evidence to the effect that on April 19, 1942, the plaintiff's husband was discovered dead on the mezzanine roof of the San Juan Hotel in Orlando, Florida; that during the night of April 17, 1942, the plaintiff's husband, who was at the time registered at the Seminole Hotel in Jacksonville, Florida, had a nightmare which he related to his friend George T. Wilson on the following morning, while at breakfast; that this nightmare was vivid and was that the occupants of an adjoining room in the hotel were plotting to take the life of the plaintiff's husband; that on the morning of April 19, 1942, while the plaintiff's husband still remained at the hotel in Jacksonville he again had a nightmare in which the plot to take his life by the occupants of the adjoining room was so real and vivid that in a semi-conscious condition and under the spell of the nightmare he fled in pajamas and barefooted to the room of George Wilson in the same hotel, and in a delirium of fear whispered to Wilson the details of the plot in the nightmare; that during this time he was pale, trembling, and broken out in beads of sweat, and was obviously in extreme fear for his life; that he remained in Wilson's room for about two hours before he had recovered sufficiently to return to his own room; that on the afternoon of April 19, 1942, the plaintiff's husband traveled to Orlando, Florida, where he registered at the San Juan Hotel; that after having eaten supper he went to his hotel room where he apparently did some work; that about 10 o'clock p. m. he was reported to the hotel authorities as calling for help in his room; that a colored bell boy immediately went to his room to see what assistance could be rendered him; that he was calling out: "God help me! Save me! Don't let them kill me!" that this continued probably ten or fifteen minutes; that the bell boy went back downstairs, and was directed *Page 395 
by the manager of the hotel to go into the room occupied by the plaintiff's husband; that the bell boy entered the room by taking the pins out of the hinges of the door which was a ventilated door opening outwardly into the hall, and during the time he was attempting to enter the room, which was perhaps five minutes, the plaintiff's husband was calling for help; that before the bell boy proceeded to get into the room by force he knocked on the door and asked the plaintiff's husband if he could let him in, and the bell boy testified that he understood the plaintiff's husband to give him a negative answer; that just as the bell boy got the lattice door off he heard the noise of a slight movement in the room, and then just before he stepped into the room he heard a clicking noise; that when he got into the room he could not find the plaintiff's husband, and noticing that the screen at the window was out went to the window, looked out, and saw his body on the roof of the mezzanine about forty feet below. There was evidence to the effect that there was no disorder or disarrangement of the room occupied by the plaintiff's husband; that there were some letters carefully arranged and stacked on the desk in the room with a weight on them; that the body of the plaintiff's husband lay on the mezzanine roof about seventeen feet from the wall or side of the hotel; that there was a radiator directly in front of the window which stood out several inches from the wall; that a person could not get between the radiator and the window, but in order to reach the window would be forced to stand about twenty inches back; and that the screen which was found on the mezzanine roof below was noticeably bulged or pushed out on the lower right-hand corner, and looked as if some one or something had hit it and knocked it out. Dr. C. S. Craven, a physicist of Emory University, testified on the basis of the vertical and horizontal distance traveled by the body of the plaintiff's husband to the roof below, that in order for the body to have traveled a horizontal distance of seventeen feet in falling a vertical distance of forty-three feet it would have had to leave the window with a horizontal velocity of about eleven feet per second, which is the equivalent of a trotting run, and that a person who merely fell from the window would not have fallen more than two or three feet out from the bottom of the wall. This witness further testified that he could state with mathematical certainty that it would be impossible for a person falling from the window to travel *Page 396 
seventeen feet horizontally while merely falling through a vertical distance of forty-three feet. There was no evidence tending to show that the plaintiff's husband had any financial worries, or marital troubles, or worries relative to his health, or any other matters which might cause a sane person to commit suicide. It appeared from the evidence that the policy sued on had been issued by the defendant and delivered to the plaintiff's husband on November 15, 1941; that there was no issue relative to the policy being in force at the time of the death of the plaintiff's husband; that the policy contained the following provision: "If the insured, whether sane or insane, shall die by his or her own hand or act within two years from the date of issuance of this policy, the liability of the company under this policy shall be limited to the return in one sum of the amount of premiums paid, less any indebtedness to the company." The plaintiff's husband met his death on April 19, 1942, which was less than one year from the date of the issuance of the policy.
The trial judge, on motion of the defendant, directed the jury to return a verdict for the defendant, on the ground that it appeared from the evidence that the plaintiff's husband met his death by his own hand or act within two years from the date of the issuance of the policy, and that the liability of the defendant under the policy was limited to the return of premiums paid by the insured; and the court directed the jury to return a verdict for the plaintiff in the sum of $52.56, the amount of premiums paid, which sum the defendant had tendered to the plaintiff. The plaintiff moved for a new trial; and to the judgment overruling the motion for new trial she excepted.
It appears from the evidence that the plaintiff's husband, immediately before his body was precipitated through the window of his room on the sixth floor of the hotel, and fell to the mezzanine roof some forty-three feet below, was in a state of fright or delirium, and it not appearing from any evidence that he possessed any realization of the height of the window from the roof on which his body fell, and since there must be some mental intent on the part of a person to take his own life by the doing of some act which would naturally *Page 397 
tend to destroy his life in order to constitute death by his own act, suicide, the inference is not demanded, even though the plaintiff's husband by his own act may have precipitated his body through the window, that his act was done with suicidal intent, irrespective of whether he at the time was sane or insane.
Where a person is found dead under circumstances which are consistent with non-suicidal death, the presumption is that such death was not suicidal. Mutual Life Ins. Co. v. Burson,50 Ga. App. 859 (6) (179 S.E. 390); Jefferson Standard Life Ins.Co. v. Bentley, 55 Ga. App. 272 (190 S.E. 50). There being a presumption under the evidence here that the insured did not die by his own hand or act with suicidal intent, and a presumption that his death, although caused by his own hand or act, was accidental and without suicidal intent, and the defense of suicide by the defendant being an affirmative defense, and the burden being on the defendant to establish such defense, it was error for the court to direct a verdict for the defendant.
Under the evidence and the ruling of the Supreme Court in answer to the question certified by this court, the defendant company is liable for the face amount of the policy sued on, and the court erred in directing a verdict for the defendant, and in overruling the plaintiff's motion for a new trial. SeeChristensen v. New England Mutual c. Co., 197 Ga. 807
(30 S.E.2d, 471).
Judgment reversed. Parker, J., concurs.