Under the facts of the case the verdict for the insurance company was demanded. The action was on an insurance policy providing for double indemnity if death resulted from bodily injury effected solely through external, violent, and accidental means, and that the double indemnity should not be payable if death resulted directly or indirectly from disease or bodily or mental infirmity. If the insured was same the evidence shows conclusively that his death was suicide. If he was insane his death was caused directly or indirectly by mental infirmity. In either event the beneficiary was not entitled to recover, and the court did not err in directing a verdict for the company and overruling the plaintiff's motion for a new trial.
 DECIDED SEPTEMBER 20, 1944. REHEARING DENIED OCTOBER 27, 1944. *Page 665 
Mrs. Fannie Cohen, as beneficiary, sued the Mutual Life Insurance Company of New York to recover $2000, and damages and attorney's fees, under the double-indemnity provisions of an insurance policy issued to the deceased insured, Joseph Cohen. The court directed a verdict for the insurance company. The beneficiary excepts to the overruling of her motion for a new trial. The insurance company paid the face amount of the policy without prejudice to the claim for double indemnity. The policy provided that $2000 double indemnity would be paid "upon receipt of due proof that such death resulted from bodily injury effected solely through external, violent, and accidental means, and occurred within ninety days after such injury and before the policy anniversary nearest his 65 birthday . . provided that the double indemnity shall not be payable if death resulted directly or indirectly from disease or bodily or mental infirmity; from self-destruction, whether sane or insane." The sole question is whether a verdict was demanded for the insurance company under the terms and provisions of the policy.
Albert A. Verestej testified in substance: that the deceased was killed by being run over by an army truck at Keesler Field, Mississippi, driven by Walter D. Everitt; that he and Everitt were the only occupants of the truck, and were seated on the front seat; that as the truck approached an intersection at about 15 miles per hour, and when it was within 30 or 40 feet of the intersection, he saw two soldiers standing on the curb; that the one-way street upon which they were driving was about 20 feet wide, and the truck was about 10 or 15 feet from the right-hand curb; that as the truck slowed up for the intersection, and when about 10 or 15 feet from it, one of the soldiers (the insured) took a few steps, and then ran a little and "dove" right in front of the truck; that the driver turned his wheels sharply to his left to try to avoid hitting him, but the right front wheel ran over him; that the truck went about a foot after it hit the deceased, skidding as it hit him, and stopping up against the left-hand curb; that by "dove" he meant a sort of flying tackle, if one wanted to refer to a football term, as though he were making a tackle at somebody real low; that he did not know whether or not he knew he was diving in front of the car; that he did not know what the other soldier that he *Page 666 
saw standing there did; that they never saw him after the injury; that the other man did not come into the road by the truck.
Lieutenant Presh A. Wagnon testified in substance: that he first knew the deceased when they were inducted at Fort McPherson; that they went from there to Keesler Field together; that the deceased behaved in a very, very peculiar manner during the time that he was at Keesler Field; that the first thing he noticed wrong with him was the fact that he took his watch and completely tore up the watch band with his teeth; that he had the mistaken idea that he was going overseas in a very, very short time without any training; that he talked about it continually whenever he was with him; that he saw him quite often while he was in that condition; that he was in the lowest possible spirits, his morale being the lowest of any soldier he had ever seen; the gist of his statements was that he was being sent overseas without any training, and that something was going to happen to him, and that he was not coming back; that every little thing seemed to excite him; that he never heard him make any statements in regard to taking his life; that when he saw him on the morning of his death, he would say that in his opinion he was mentally unbalanced, and at a very high nervous tension; that he was crying and still carrying on a crazy conversation; that the thing that caused his trouble was that a sergeant told him he had to move his own bed to another barracks; that he started crying, and shortly thereafter they had to move his bed and possessions over to another barracks; that the only other statement he heard the deceased make was that he was worried because his mother would not be taken care of; that he rode on the train with the deceased from Fort McPherson to Keesler Field; that he and the deceased were very, very young, and very, very afraid, and had somebody awfully mean in charge of them.
Walter B. Everitt, testified in substance: that at the time of the injury he was traveling north on about a 20-foot-wide street, on the right-hand side of a double-drive road; that he was driving about 15 miles an hour as he approached an intersection; that private Albert Verestej was with him in the truck; that as he approached the intersection he saw two persons standing on the right-hand side of the road; that the first time he saw them they were about 40 feet away, standing there talking; that as he noticed them standing there he turned the car a little over to the left, glanced to his *Page 667 
left to see if there was anything coming, and as he turned his head back to the right he saw this boy just finishing a spring or dive, as though he was diving like playing football, or something like that; that he turned the wheels of the car to the left and tried to avoid striking him; that when he stopped, his left wheel was against the left curbing and Cohen was lying under the machine about even with the front door on the right-hand side of the machine; that if he had continued driving in a straight line, and if the deceased had stood in the same position as when he first observed him talking to the other soldier, there would have been a space of about eight or ten feet between the truck and the deceased when he passed the point where the deceased was standing; that he did not see the deceased stumble or fall as he approached him; that he saw him run out and dive; that if the deceased had fallen in the direction of the truck he would not have reached the point where the wheel came in contact with his body; that his reasons for so stating were, that the deceased was only about 5 feet, 8 or 9 inches tall, and the witness was 8 or 10 feet away from him, and if he had just fallen over the witness certainly would not have hit him; that when he turned his head to the left he was about 10 feet from the intersection; that he did not think the deceased probably could have been confused and attempted to run out as most people do when they see a car coming and then jump back; that he had seen a person get confused in traffic, start across the street, and then stop, and then try to get back; that this was not that kind of jump; that it is not possible that the soldier who was with the deceased might have pushed him into the street; that the other soldier was still standing at the curb; that when he saw the deceased falling or diving in the street he applied the brakes and turned to the left.
A. E. Garber testified in substance: that he had known the deceased since 1932 or 1933, but not intimately until about 1937 when he became the witness's brother-in-law; that he worked for the witness about two and a half years; that the deceased was inducted into the army on February 6, 1942, and that the witness, the deceased's father and mother and three sisters, one of whom was the witness's wife, went to see him on February 9, 1942, and remained at Fort McPherson about an hour and a half; that the deceased's general demeanor at that time was perfectly normal in *Page 668 
every respect so far as they could see; that he talked very jovially; that he told them he was being sent to Keesler Field, and that he was assigned to a cooking school; that he told his sister that when he got through he would show her how to cook; that he was just making sport of her at the time; that the deceased worked for him for about two and a half years; that he was never nervous at all during that time, and in fact took things too calmly; that he was not a very good business man; that he was just inclined to be good natured.
This witness identified the following letter from the deceased to J. Cohen, postmarked February 13, 1942, the day before his death. "Dearest Folks, How you all? I am feeling fine. I arrived here last night around 10 o'clock. Had a good trip down. We played poker and drank beer. I think I'll start in cooking tomorrow. There is several different things you can take up here so will see if I want to make a change. This sure is a big camp here. There are a good many Jewish boys here. The food here is plenty rich. One thing they do is feed you good. You sure do have an appetite. They are having a dance to-night, so think I will put on my full dress suit and go. I'll write real soon — as soon as I can get settled. Tell everybody hello for me. By everybody I mean all those I know. Write me real soon. Love to you all. Joe."
Irrespective of which party had the burden of proof, a verdict for the insurance company was demanded, and the court did not err in directing a verdict for the company, or in overruling the plaintiff's motion for a new trial. If the insured was sane, the evidence is conclusive that he deliberately committed suicide. If such was the case death was intentional, and therefore not accidental. If he was insane his death was directly or indirectly the result of mental infirmity, and this fact, under the provisions of the policy, precluded recovery of the double indemnity. See Harris v. Metropolitan Life Ins.Co., 66 Ga. App. 761 (19 S.E.2d 199). In that case death was caused directly or indirectly by disease, but the principle is the same if force and effect are given the terms of the policy sued on. It is not necessary here to discuss the applicability to this case of the decision of the Supreme Court in *Page 669 Christensen v. New England Mutual Life Ins. Co., 197 Ga. 807
(30 S.E.2d 471), for the reason that the policy provisions there involved did not contain the provision as to mental infirmity. The facts do not support a finding that the insured fell accidentally in front of the vehicle or any other theory which would have made the death accidental if the insured had been sane. The court did not err in overruling the motion for a new trial.
Judgment affirmed. Sutton, P. J., and Parker, J., concur.