1. The motion to dismiss the writ of error is without merit, and is overruled.
2. Under the evidence in the present case, both as to motive and physical facts connected with the death of the insured, and all reasonable inferences and deductions therefrom, the presumption of law on the question of suicide or accidental death was clearly overcome, and demanded a finding as a matter of law that the insured came to her death by her intentional act of self-destruction while sane; and the contract of insurance providing that it should be void in the event the insured should die by her own hand or act, whether sane or insane, and not be incontestible until two years after the date of issue of the certificate of insurance, and it affirmatively appearing that the insured died by her own intentional act before the expiration of such period, a verdict in favor of the defendant was demanded as a matter of law.
3. The special grounds of the motion for new trial are without merit.
 DECIDED OCTOBER 17, 1940. REHEARING DENIED NOVEMBER 15, 1940.
Hodges Newsome, as beneficiary, brought suit against Supreme Forest Woodmen Circle, a non-resident fraternal benefit society, having a subordinate lodge in Warren County, Georgia, to recover under a benefit certificate issued on September 1, 1937, to Vonnie Newsome, his sister, a member of the subordinate lodge, a copy of the certificate being attached to the petition and made a part thereof. The petition was brought in two counts, but only the second count is relied on for recovery. In that count it is alleged that the policy, termed a benefit certificate, was an ordinary life policy with disability provisions, and was issued in the face amount of $1000 for an annual premium of $23.28; that Vonnie Newsome died on April 14, 1939; that all due premiums had been paid to that date, and due proof of death had been submitted to the defendant, but that it had refused to pay the amount due under the policy, although demand therefore had been made more than sixty days before the filing of the suit. The defendant answered, admitting that it issued the certificate, and that it had failed and refused to pay the death benefit thereunder; but it alleged that for reasons hereinafter shown its refusal was justified; that on August 20, 1937, Vonnie Newsome made written application for a beneficiary certificate of membership, in which she agreed, among other things, that the application, constitution, laws and by-laws *Page 551 
of the circle then in force or thereafter enacted should constitute the basis for and form a part of any beneficiary certificate that might be issued to her; that based on said application it issued to her certificate No. 647586, in the face amount of $1000, dated September 1, 1937, which contained the provision that the contract between it and Vonnie Newsome consisted of the application, the constitution, laws and by-laws of the defendant society, its articles of incorporation, and the beneficiary certificate of membership; that the constitution, laws and by-laws of the defendant society in force at the time she became a member, and at the time of her death, provided that "if the member holding the certificate . . should die . . by her own hand or act, whether sane or insane, . . the certificate shall be null and void and of no effect, and all moneys which shall have been paid and all rights and benefits which may have accrued on account of the certificate shall be absolutely forfeited without notice or service;" that Vonnie Newsome died on April 14, 1939, as the result of intentionally taking strychnine; that the cause of her death was suicide, by strychnine self-administered, and therefore that the defendant is not liable to plaintiff in any sum.
The evidence on the trial was substantially as follows:
Hodges Newsome, the plaintiff, testified that Vonnie Newsome was his sister; that she died at Kite, Johnson County, Georgia, about April 14, 1939; that he lived in Glascock County, Georgia, and while at work about three o'clock p. m. received notice of her death; that S. A. Blanchard got the body and took it to his funeral home; that the witness had proofs of death mailed to the defendant, and Mrs. Blanchard helped him prepare them at his house, she filling them out and signing them as a notary public, and the witness signed one paper; that Blanchard as his agent wrote to the defendant about his claim, and witness authorized it and got Blanchard to write for him certain letters which were exhibited to him; that at one time he went to Kite to see Mr. Claxton, taking along the certificate sued on, and Claxton saw it, and witness asked if as beneficiary he could recover under it; that he showed him a letter and had him to read it, Mrs. Land, the sister of the witness, being present; that Blanchard asked him if he wanted him to write the defendant a letter, saying that if he signed the witness's name to it the letter was that of the witness, and that if *Page 552 
he signed his own name the letter was Blanchard's; that witness did not know whose name Blanchard was signing, but he said he would write a letter for the witness; that the witness could not sign his name, and did not put his mark on any letter, but authorized Blanchard to write a letter.
J. Ellis Claxton testified by deposition for the defendant, that he was a druggist in Kite, Georgia, operated a drug-store, and had known Vonnie Newsome since she had been in Kite, about two years; that she had been sick or ill before her death, and had bought some drugs from him; that a few days before her death she tried to buy some strychnine from him, stating that she wanted to kill some things that were bothering her chickens; that he would not sell it to her; that he did not know whether or not she had any chickens; that she got in bad health before she died, and looked like she was worrying herself to death about something, but he did not know what it was, but was a good observer and very careful to whom he sold strychnine; that after her death a bottle labeled strychnine was found in her pocket-book or purse, and he personally saw it removed therefrom and brought it away and has kept it in his custody; that about one eighth of the contents was missing when it was found in her room, which was right across from the telephone exchange where she had been working in Kite; that he saw some letters at the telephone exchange, and at the telephone exchange he heard read aloud there a letter in regard to calling the undertaker, and later, in the back room of his drug-store, he heard his father read aloud the letters to several persons, and to the best of his recollection Hodges Newsome and Miss Newsome's sister were present; that his father is an insurance man, and they had an insurance policy, and the witness thought they were getting some information from him and were there for that purpose. On cross-examination he testified, that he knew that Vonnie Newsome had been sick and had come into the drug-store sick a few times; that the only way he would know she was sick was because of the prescriptions given to her by doctors; that her appearance did not indicate that she was normal, and she was not able to come and get the medicines every time, and he would send them to her sometimes; that she was a nervous woman the few times she came in the store, and her physician prescribed for the nervousness a few times; that he did not remember the type of medicine he gave her, but *Page 553 
knew that some bromides were given several times, sometimes with and sometimes without a prescription; that her health got bad and she worried a whole lot the last few months, but other than her worrying and nervousness the condition of her health, as far as he could tell, was pretty good; that she worried about her health, and he thought she was worrying a whole lot about a little money she lost; that it was just his opinion as to whether she worried; that he is not a specialist but a druggist; that he did not know that she took poison but he knew that when he refused to sell her the strychnine she went to another drug-store, and he saw her go there; that he saw the body lying on a bed at the telephone exchange after her death, that her face was natural, the body dressed; that he did not observe her closely, and he did not know whether her eyes were closed and whether her lips were parted or closed, and did not pay attention closely enough to notice anything about her mouth, or where her hands and arms were, or the condition of her lower limbs; that the bottle labeled strychnine, found in her purse, was about an inch and half bottle, one eighth of an ounce bottle; that the only way he knew it contained strychnine was because of the label, and he did not make an analysis of it; that it came from Wrightsville, according to report, and he did not know how much was in the bottle to begin with; that a medical dose of strychnine is about 1/40th to 1/60th of a grain — 1/30th would not kill one, but the average dose is about 1/40th to 1/60th; that the last time he saw the letter which he heard read was in the office of Dr. Z. H. McKinney in the back of the drug-store, and he thought his father had it in his hands, but was not positive about it, and to the best of his memory Miss Newsome's sister had the letter before his father had it; that witness testified about two letters, and one of them was a letter the deceased wanted given to some of her folks; that the letters read were read by his father, in the presence of Hodges Newsome and his sister, as letters written by Miss Vonnie Newsome, and neither of them denied, at the time they were read, that they were written by her.
Dr. Z. H. McKinney testified for the defendant, that he was a practicing physician, having graduated from the Nashville Medical School in 1910, and on April 14, 1939, was practicing medicine in Kite, Johnson County, Georgia; that before that date he had occasion to treat Vonnie Newsome, that she was awfully nervous *Page 554 
and had severe pains in the lower part of her stomach, and he gave her punctures and sent her to a hospital in Sandersville for an operation; that her ovaries were affected, and she was awfully nervous after that, and he treated her; that he was called to the telephone exchange at the time of her death, and found her in a dying condition, lying across a bed there which she used at night for sleeping, she being on duty in the exchange at night; that she breathed just a few times after his arrival, and every time she would breathe very far apart, would breathe deeply and throw her arms back, doing that four or six times; that he examined her eyes and found the pupils dilated, and she was having difficulty in breathing, and each deep breath would seem like the last one; that she was in a kind of convulsion, and her hands were clenched as she lay on her back on this ordinary bed, and from the condition in which he found her he diagnosed her condition as death from strychnine, and that is still his opinion; that she died in three to five or six minutes after his arrival; that some time after her death he heard some letters read by C. L. Claxton in the office of the witness, back of the Claxton drug-store, there being present one of Miss Newsome's brothers, one of her sisters, one of the Claxtons, the witness, and Mr. C. L. Claxton; that Claxton read over an insurance certificate to see if there was any clause where they could not collect insurance in case of suicide by Miss Newsome; that Newsome handed the letter to Claxton, and Newsome specified that they were letters from his sister; that the letter which was read was just a statement, — she was dividing the property she had, wanted her sister to have her furniture, and, as well as the witness remembered, wanted her brother to have her interest in the telephone exchange; that she named whom she wanted to be pallbearers, the place where she wanted to be buried, and the time, and, as the witness thought, the one to preach her funeral.
On cross-examination Dr. McKinney testified, that he was paid $25 for testifying at Kite, and was being paid $25 for testifying on the trial of the case: that it was Hodges Newsome, to the best of his recollection, who handed the letters to Claxton; that Vonnie Newsome's case was the first case of strychnine poisoning that he ever saw; that he did not see her first convulsion, that he saw her on the bed, crosswise, with her feet hanging off the edge of the bed and her head drooped; that the symptoms which made him *Page 555 
think she had taken strychnine were her deep breathing, very slowly, dilated eyes, and the drawing of her arms (indicating) every time she would breathe, and the expression of her face after she had breathed; that she was breathing very slowly, and had a grinning smile on her face, and the pulse was very rapid; that he did not examine the contents of her stomach, and there was no inquest, and the whole town and family said it was not necessary; that he walked out of the room after she died; that he got there about five minutes before she died, and did not do anything for her, because he saw she was dying; that he knows that strychnine will kill; that Vonnie Newsome was lying across the bed and all of her body touching it; that a person lying in her position on her back could not have kept from bowing up; that all parts of her neck and shoulders were touching the bed; that he could not say whether she was bathed in perspiration; that she did not have enough for him to notice it; that a person who takes strychnine will have a higher body temperature, but he does not know whether such a person will be bathed in perspiration; that he did not notice any kind of red or livid color about her lips, but a person who takes strychnine will have that kind of lips; that he did not notice her finger-nails, but he diagnosed her case as dying from strychnine; that he did not examine her for symptoms, because he saw he could not do anything for her; that she had a dying look in her face, and died in a few minutes and was "gone" when he first saw her; that he could not tell whether her limbs were close together, and could not say whether her feet were turned in or out; that when a person takes strychnine the limbs will be separated and stiff; that he did not examine her, but felt her pulse and looked at the pupils of her eyes, and, as well as he remembered, her eyes were partly open and on her face she had a kind of smile, but if she had any blood or foam at the mouth he did not see it; that he did not know the formula of strychnine, but the average medical dose is from 1/100th to about 1/20th; that bromide is one treatment for strychnine, but in this case he did not have time to give anything; and that he did not try to make her vomit, as it might have strangled her to death.
J. L. Claxton testified for the defendant, that he was chief of police at Kite, Johnson County, Georgia, in April, 1939, and is now; that he went to the telephone exchange on the occasion of the *Page 556 
death of Vonnie Newsome, and found her lying on the bed, already dead; that there were two letters on the telephone board in the room, addressed to her sister and her brother, and they were not read before the undertaker came; that he and Mr. Palmer, the mayor, went to her house and found a bottle marked strychnine and "poison," with some of the contents missing, the same being in her room just across the street from the telephone exchange and where she had been living not more than a week, formerly living in the exchange; that on their return to the exchange (twenty-five or thirty persons being present) the undertaker Blanchard was there reading some letters as to where the deceased wanted to be buried, and later in the day the witness heard the letters read; that he did not know who handed the letters to the undertaker at the telephone exchange, but he did not see Hodges Newsome with the letters in his hand.
L. L. Palmer testified for the defendant, that he reached the telephone exchange about twenty minutes after Vonnie Newsome died; that he and J. L. Claxton made an investigation of her room, and found a bottle of strychnine (presented to him on the stand), but did not know that it contained strychnine; that some of the contents had been taken out when the bottle was found, and he did not know what was in the bottle; that he was mayor of Kite at the time, but went out of office the night before his testimony; that something was said about some letters; and that Vonnie Newsome was lying crosswise the bed at the telephone exchange.
C. L. Claxton testified for the defendant, that he lived in Kite, Georgia, had been there about forty years, and was a notary public and agent for the Mutual Life Insurance Company, and the father of Ellie Claxton, the druggist; that he had known Vonnie Newsome four or five years; that after her death her sister and brother came to see him at his son's drug-store and showed him one or two letters and a policy, and wanted him to give them some information as to whether the insurance would be good or not, handing him the certificate or policy to examine, together with some letters which he read aloud; that he thought his son and Dr. McKinney were there, and his recollection was that the letters were written to some of Vonnie Newsome's people, and in them she said she was going home and would not return any more, and named her pallbearers; that he read the policy, and told them he thought it would be all *Page 557 
right; that he did not see any clause in it in regard to suicide; that he did not know who wrote the letters; that Hodges Newsome gave them to him, and he and his sister took them away, and he had not seen them since; that Hodges Newsome asked him about collecting the insurance; that either he or his sister handed him the letters; that he did not remember just what they then said, but what they wanted to see him about was mainly in regard to the certificate; that they were asking him if they could recover in case of suicide, and he thought it was understood that it was suicide; that at the time they were talking to him it was an accepted fact that it was suicide; that suicide was the main issue and was mentioned, and he was examining the policy as to that feature; and that the two were near enough together for a statement by one as to suicide to be heard by the other.
W. Y. Dunaway testified for the plaintiff, that he helped embalm the body of Vonnie Newsome; that it was limp and lying in a normal condition, her back not arched in a bow, practically a smile was on her face, and her feet were practically together, with the right foot turned in an angle, that her blood was very red, and her clothes were not saturated with perspiration.
Dr. A. W. Davis testified for the plaintiff, that he had been a practicing physician in Warren County twenty-three years and had learned a little about strychnine poisoning; that in such a case there is usually a livid color around the lips, and the patient usually has a condition somewhat like meningitis; that the head would be drawn back, and there would be a curvature of the spine forward, the legs usually stretched, the muscles tight, usually but not necessarily a foaming of the mouth, a drawn and agonizing look, not a smile, and the pupils would be dilated; that if a person is lying on a bed, with her eyes dilated, and she is drawing her arms (as indicated by counsel) and is breathing hard, he could not say whether the condition could be diagnosed as strychnine poisoning; that the condition described is kin to some other condition, brain lesion and some forms of heart attack; that there is no way to be positive whether it was strychnine poisoning; that if a person had those conditions, but had an absence of perspiration, and the back was in a normal condition, and there was no livid condition about the mouth and no discoloration of the finger-nails, he would not diagnose the case as strychnine poisoning without a stomach analysis; *Page 558 
that risus sardonious is a kind of grin, not a smile, and the lips are drawn; that the most prominent things about strychnine poisoning are dilated eyes, convulsions, and a feeble pulse, and the first thing he would notice would be the dilation of the eyes; that for one's back to become arched one has to have a support for the shoulders; that where one in lying on his back the shoulders and feet have to be resting on something in order for the body to form an arch, and if one were in a convulsive form the back would be drawn; that difficulty in breathing is no marked symptom; that he has had one or two cases of strychnine poisoning, but when he talks about symptoms he is relying on medical books, and even where one has practiced a long time and has had certain types of diseases under observation he has to go to his medical books if he has to give testimony; that strychnine will make the blood dark; that where one is dying from strychnine poisoning the doctor can give him a stimulant or cause him to vomit; and that vomiting may be produced by salt water, and might prolong life.
The following documentary evidence was introduced:
Beneficiary certificate No. 647586, issued to Vonnie Newsome, dated September 1, 1937, by Supreme Forest Woodmen Circle, which provides, among other things, that "The articles of incorporation, the constitution, laws and by-laws of the Society, and all amendments to each thereof which may be made hereafter, the application for membership signed by the applicant and approved by the medical director of the Society, including the statements of the applicant to the medical examiner as recorded by him and signed by the applicant, together with the medical examiner's report when a medical examination is required; and this benefit certificate shall constitute the agreement between the Society and the member, and copies of the same, certified by the national secretary, shall be received in evidence as proof of the terms and conditions thereof."
Application by Vonnie Newsome for membership in the defendant society, and issuance of a beneficiary certificate to her, dated August 20, 1937, the material part of which is: "I hereby consent and agree that this application, to which I have attached my signature, and all the provisions of the constitution and laws of the Society, now in force or that may hereafter be adopted, shall constitute the basis for and form a part of any benefit certificate that may be issued to me by the Supreme Forest Woodmen Circle, whether printed or referred to therein or not." *Page 559 
The 1935 constitution, laws and by-laws of defendant society, in force at the time of Vonnie Newsome's application, the issuance of the certificate and her death, the material sections of which are as follows: "Fourth. If the member holding the certificate shall . . die . . by her own hand or act, whether sane or insane, . . the certificate shall be null and void and of no effect. Sec. 42. When a benefit certificate has been in force for two consecutive years immediately preceding the death, while in good standing, of the member holding the same, the payment thereof shall not be contested on any ground other than that her death was intentionally caused by the beneficiary or the beneficiaries, or by the hands of justice, or for presumed death on account of absence or disappearance."
Proofs of death, consisting of affidavit of beneficiary, certificate of attending physician, and statement of the grove officers. In the affidavit of the beneficiary, Hodges Newsome, appeared the statement, "the cause of her death being suicide." The certificate of the attending physician, Z. H. McKinney, stated that the cause of death was "strychnine self-administered," and that the predisposing cause was "nervousness extreme." The statement of the grove, of which Vonnie Newsome was a member, recites that "her death resulted from nervousness, and she took strychnine — suicide."
Letter from the defendant, dated May 10, 1939, addressed to the plaintiff, acknowledging receipt of proof of death, but denying liability, on the ground that the proofs showed that the cause of death was "strychnine self-administered" with suicidal intent.
Letter from "Hodges Newsome," dated May 13, 1939, to the president of the defendant society, demanding payment under beneficiary certificate, and stating that he owed undertaker over $400, and that "I also read over the policy and had Mr. Blanchard to carry it to a lawyer to see if it was any good, and he said that you would certainly pay it as it was over a year old, and that even the contract of membership did not state that it would be void if she took her life after a year, but it does state that in the men's contract."
Letter to president of defendant society, dated May 13, 1939, from S. A. Blanchard Funeral Home, signed by S. A. Blanchard, stating that Mr. Newsome was in to see them in regard to the insurance on Vonnie Newsome in the amount of $1000, and that *Page 560 
"I have charged to Mr. Newsome for funeral expense over $400, and I can not afford to lose on this account, and I carried this policy to a lawyer and one of your applications for membership, and there is no clause in there that states that after a policy for a woman over a year old, which this one happens to be, shall be void if they take their life," and that "I will spend $1000 before I will see him beat out of it."
Letter to president of defendant society, dated May 19, 1939, signed S. A. Blanchard Funeral Home, by S. A. Blanchard, insisting on payment of the claim under the certificate issued to Vonnie Newsome, and stating that "she was in the best of health until this happened; in fact she was working at Kite, Ga., on the switchboard as operator the day she took her life; and I have a letter written by her how she wanted to be buried, stating even the pallbearers and minister she wanted. She also wrote her brother a letter and her sister. These letters we now have at hand, and will be glad to produce them if necessary."
Letter to H. C. Fabian, Atlanta, Ga., dated May 22, 1939, signed "S. A. Blanchard," and by him forwarded to defendant society, asking him to write to the president of the society to reconsider the claim of Newsome, and stating that "On April 14, 1939, we had a call to Kite, Ga., to come after Miss Vonnie Newsome, who had just died while at work. In fact she worked for the telephone exchange there, and took strychnine while at work, and of course that ended her life, but until then she had been in good health. Really her trouble was that she had loaned out all of her money that her mother had left her, who died in 1936, and she just did not have the nerve to let her people know that she was broke." The letter also refers to the amount due for the funeral and states that "I will lose same unless Mr. Newsome carries it to court, and I will have to help him do so, as I have so much invested now that I will have to see it through."
A certified copy of license to do business in Georgia, issued March 2, 1939, by W. B. Harrison, Insurance Commissioner, to defendant society.
A one-eighth ounce bottle, about three-fourths full of a white powdery substance, showing evidence of having been opened, and labeled as follows: "1/8 oz. 3-63 98 Strychnine Sulphate Merck 33648 U.S. P. Powder (C21 H22 O2 N2) H2SO4 5H2O MOL. Wt. *Page 561 
856.53 Merck Co. Inc., Manufacturing Chemists, Rahway, N. J. POISON."
Mrs. S. A. Blanchard testified for the plaintiff, that she was the wife of the owner of the funeral home, and was its secretary; that she filled in for the doctor the paper which was exhibited to her by counsel, and was in a hurry; that Mr. Newsome said, "Whatever you say is all right, I will sign it," and she said that the doctor had put down that his sister was a suicide; that Newsome was not contending that his sister committed suicide, other than what the doctor had said; that she put in the proof of death, that it was suicide, filled out her part of the proofs of death, and was helping the grove get up the proofs of death and filled them out, buried the body, and made an affidavit accordingly; that the paper exhibited to her is her certificate of burial; that the signature on a letter exhibited to her is Mr. Blanchard's; that there were some letters written by Miss Newsome that she heard read, and they contained directions as to whom she wanted to bury her, but she would not commit herself as to everything in the letters; that they were opened and read, but she can not answer as to what they contained; that the letter to Mr. Blanchard did not mention any property, and there was a letter addressed to Mr. Newsome and one to Mrs. Land, which letters the witness delivered to Mr. Newsome and read to him; that they contained provisions as to pallbearers and that the personal property should go to Mrs. Land, but not in the letter to Mr. Blanchard, which just stated that she wanted him to bury her and where to bury her; that it would be unfair to the court to try to state what was in Mrs. Land's letter, but she read it to Mr. Newsome; that so far as she knew nobody but the doctor said it was suicide, and she had to go by the doctor's signature; that she told Mrs. James Williford that the doctor said Vonnie Newsome committed suicide, but did not tell her that Vonnie Newsome telephoned to the witness that she had taken strychnine; that she and Mr. Blanchard did what they could to help Hodges Newsome get his claim paid, and will continue to do so; that he had them to write some letters, and they were trying to help him, they had so much invested; that the reason they were in such a hurry was that they have to have a burial permit before burying anybody, that she saw Vonnie Newsome when she was brought into the morgue; that her dress was not messed up; that *Page 562 
she had a smile on her face, and the witness saw her in the embalming room, and her hands were not clenched, and there was no evidence of death by suicide, but it looked like she came to her death normally, she did not have any purple around her lips, and her color was good, and there was no perspiration about her, her head was not drawn back, and her hands were not even drawn; that as to the affidavit, Mr. Newsome left that to the witness, and the only information she had was from the doctor, and Hodges Newsome did not give her the cause of death; that he asked her to sign his name to the certificate, and he touched the pen, and she swore to it.
After the case had been reopened for the testimony of Mrs. Blanchard, it was agreed by counsel for the plaintiff that counsel for the defendant might state what he expected to prove by Mrs. Williford, a sister of Hodges Newsome, and who was not present in court; whereupon counsel for the defendant said: "I will state that Mrs. Williford, a sister of Mr. Newsome, if she were present, in accordance with what she told me, would testify that Mrs. Blanchard, shortly after Miss Newsome was buried, stopped at her home and told her about the death of Miss Newsome; that she did not attend the funeral because she did not hear about it until too late. Mrs. Blanchard told her about her committing suicide and taking strychnine, and about the letters and what was in the letters, and that the letters stated she was coming home from Kite, never to return, that she wanted certain parties to be her pallbearers, that she wanted Mr. and Mrs. Blanchard to conduct the funeral, that there were certain other things in the letters about the disposition of her property, and that Mrs. Blanchard told her that Miss Newsome telephoned, just after taking the strychnine and before she died, to come and get her body. In my discussion with Mrs. Williford she did not recall whether Mrs. Blanchard said as a positive fact that Miss Newsome said she had taken strychnine, or what had been told to her, that she was not sure what was said about taking strychnine; but she did say that Mrs. Blanchard said that Miss Newsome telephoned her and told her she was dying, come and get her."
Mrs. Blanchard, recalled, testified for the plaintiff, that on that afternoon Mr. Newsome was in Warrenton; that they were to get him to make arrangements for the funeral, and Mrs. Land had told them of the difficulties the family had had, and that the witness *Page 563 
said she could not pass Mrs. Williford without notifying her of the death of her sister; that she had not told any one that Miss Newsome told her that she was dying from strychnine, and Miss Newsome did not talk to any one from Kite to Thomson; that the witness stated that about five minutes before the call came in from Kite some one from Kite was trying to get them; that the doctor said she died from suicide, and the witness was trying to leave it in a tactful manner, and did not tell Mrs. Williford that Miss Newsome had `phoned the witness.
It appears from the record that the letters referred to as having been written by Vonnie Newsome, according to the contentions of the defendant, were not in evidence, but that the plaintiff was given notice to produce, and subpoenas duces tecum were served on Mrs. Land and Blanchard, the undertaker; and that each filed an affidavit denying that the affiant at that time had possession or control of the letters.
The jury returned a verdict in favor of the plaintiff. The defendant moved for new trial on the general grounds, and on special grounds which are dealt with hereinafter. The court overruled the motion, and the defendant excepted.
1. After argument of this case before the court in May, 1940, the defendant in error filed, on August 12, 1940, a motion to dismiss the writ of error, on the ground that there is not attached to the bill of exceptions or to the brief of counsel for the plaintiff in error a certificate showing that the costs accrued against it in the trial court have been paid and nowhere in the record does it appear that such costs have been paid. Respondent calls attention to the fact that the motion comes too late, because the requirements of Rule 35 of this court (Code, § 24-3635) have not been met. This rule provides as follows: "No motion to dismiss a writ of error will be considered unless notice of such motion and of the grounds thereof, in writing, be given to counsel for plaintiff in error five days before the case is called for argument, service thereof to be made and shown as required in the service of briefs. If because of the absence of counsel for the plaintiff in error such notice can not be given, the motion will be *Page 564 
entertained and such direction in reference thereto given as, in the discretion of the court, may seem proper. If the court has no jurisdiction, it will dismiss the writ whenever and however this may appear." It is obvious that the movant did not comply with the rule, but this court is requested to take note on its own motion that it is not shown that the costs in the trial court have been paid, and, even though the motion to dismiss be filed too late, to refuse to consider the case. This request does not merit dismissal of the writ of error. The appellate courts of this State are not without jurisdiction merely because the costs in the trial court have not been paid. In Perkins v. Rowland,69 Ga. 661, 662, it was ruled: "The statute, it is true, requires the plaintiff in error to enter into bond and pay the costs, or else, in lieu thereof, file the affidavit. But this failure to do so does not deprive this court of jurisdiction to hear the cause. This failure to pay costs and give bond, or file an affidavit, simply denies the complaining party a supersedeas to the judgment below, and nothing more. The giving of bond and security upon carrying up of cases to the Supreme Court is optional, not compulsory. Where no bond is given, or affidavit filed, the opposite party is at liberty to proceed to enforce his rights in the court below by execution or otherwise, subject, of course, to the chances of a reversal. 1 Kelly, 1. Neither will the writ of error be dismissed because the record does not show that the costs in the court below have been paid. If the costs are not paid, the defendant in error may cause execution to issue, and proceed at once to make it in the court below. 6 Ga. 587." See CumberlandFertilizer Co. v. Williams, 146 Ga. 27, 29 (90 S.E. 464);Bennett v. Ralf, 4 Ga. App. 484 (3) (61 S.E. 887);Spooner v. Coachman, 18 Ga. App. 705 (90 S.E. 373). Movant contends, however, that by the act of 1921 (Ga. L. 1921, p. 239), (Code, § 24-3622), enacted since the decisions above mentioned, the failure of a plaintiff in error to pay the costs which have accrued against him in the trial court will deprive this court of jurisdiction. This section declares: "Upon filing his original brief counsel for the plaintiff in error shall pay all costs due in the case, or shall file with his brief a statement that a pauper's affidavit has been duly filed to relieve him from the payment of the costs. The clerk is prohibited from receiving the brief of the plaintiff in error unless the costs have been paid, or a sufficient pauper's affidavit is contained *Page 565 
in the transcript. . . Briefs for both parties shall be filed with the clerk at least three week-days before the call of the trial calendar to which the case is assigned." It is contended by movant that the words "all costs," appearing in this section, must be taken to include the costs in the trial court. The argument, however, can not be sustained, because by reference to the act from which the section is codified it is plain that the legislature was dealing only with the costs in the appellate court. Section 1 of the act provides that from and after the passage of the act "the bill of costs in every case carried to the Supreme Court and to the Court of Appeals of this State and heard therein shall be fifteen dollars; and in every case carried to said courts, and withdrawn or dismissed on or before the same is called for argument, shall be ten dollars." Then follows the language embodied in the Code section as to payment "of all costs due in the case," etc. Section 2 provides that "out of the costs so collected" the clerk is authorized to pay named sums to his deputy clerk and to his stenographer as compensation for their services. Section 3 provides that it shall be the duty of the clerk to collect "the costs herein prescribed," and to make an annual report thereof to the State Treasurer and pay into the treasury the amount of costs shown by the report. The mere recital of these provisions negatives any idea that the General Assembly was legislating with reference to any costs in the trial court, and shows that the costs referred to are those to be paid to the clerk of the Supreme Court or the Court of Appeals. The motion to dismiss is without merit, and is overruled.
2. On the merits of the case we think, as contended by the plaintiff in error, that it could not reasonably be said that the insured died from any cause other than the intentional taking of strychnine poison. Under the terms of the insurance contract there could be no recovery "if the member holding the certificate . . should die . . by her own hand or act, whether sane or insane." It is undisputed that the deceased had been extremely nervous, worried, and depressed before her death. She had shortly theretofore sought to purchase strychnine from a local druggist. A few days later she was found, on a bed at the small telephone exchange which she operated, in convulsions and in a dying condition. Her physician was summoned, and immediately diagnosed her condition as resulting from strychnine poisoning. Several prominent citizens *Page 566 
searched her room, just across from the telephone exchange, and found a small bottle labeled "1/8 oz. strychnine Sulphate" and "poison," about 1/8 of the contents missing. At the desk where the deceased worked were found three letters without a signature, one addressed to her brother, the plaintiff, one to her sister, Mrs. Land, and one to an undertaker in the town. The undertaker read aloud to those assembled the letter which was addressed to him, stating that the writer desired him to bury her body, directing what minister should conduct her funeral, naming pallbearers and when and where she should be buried, and what should be done with the balance of insurance money on her life. A few days later her brother, accompanied by their sister, Mrs. Land, took to Mr. Claxton, an insurance agent, the two letters which had been addressed to them, together with the certificate of insurance; and these letters were by Mr. Claxton read aloud in the presence of several persons. They mentioned what the writer of the letters wished done with her property, stating that the interest in the local telephone exchange should belong to the plaintiff, and certain personal property should go to Mrs. Land. The plaintiff asked the insurance agent, Mr. Claxton, whether or not under the certificate recovery could be had in case of the suicide of the insured. In the absence of copies of the insurer's constitution and by-laws showing, as they did, that the policy or certificate was not incontestible until after two years, Mr. Claxton informed him, in effect, that there seemed to be no reason why recovery could not be had. It appears that at this juncture the plaintiff considered that the deceased had taken her own life, and in his affidavit in connection with the proof of death the statement was made, "the cause of her death being suicide." The attending physician, Dr. McKinney, reported that the cause of her death was "strychnine self-administered," and on the trial he testified that her death was produced by strychnine poisoning; that he reached the telephone exchange a few minutes before her death, and found her in a dying condition; and that from the evidence of convulsions, dilated pupils of the eyes, and difficulty in breathing he diagnosed her condition as due to strychnine poisoning. The plaintiff offered as a witness Dr. A. W. Davis, who testified to symptoms usually accompanying strychnine poisoning, but stated that in the absence of an autopsy he could not say whether or not the deceased died *Page 567 
from such a cause, inasmuch as the condition of the body as described to him "is kin to some other condition, brain lesion and some forms of heart attack." He testified, however, that the main symptoms of strychnine poisoning were those testified to and observed in the case of the insured by Dr. McKinney, and there was no evidence of any brain lesion or any form of heart trouble with respect to the insured. Dr. McKinney, who had been her physician, testified that her heart was free from any ailment. The testimony of Dr. Davis, who did not see the body, was in effect only negative, and could not be said to have raised any issue for a jury as to whether or not the insured died from any cause other than strychnine poisoning. It could not reasonably be said that the letters giving direction as to the disposition of the body of the writer and of her property were not those of the deceased. They were found on the desk at the telephone exchange which the deceased operated, and were addressed to the local undertaker and to her brother and her sister. Near by on a bed was her body. There is not in the case the slightest suggestion that they were written by anybody else, or that her death was brought about by natural causes or accidental means. There is nothing to suggest that some one might have poisoned her and have written the letters to avert suspicion. All the physical facts and circumstances point only to self-destruction by a nervous, worried, and depressed woman. To hold otherwise would be to resort to the merest conjecture or surmise.
In Gem City Life Insurance Co. v. Stripling, 176 Ga. 288,290 (168 S.E. 20), it was said: "The fact of suicide must be established by a preponderance of the evidence, but the presumption against it is not conclusive and will vanish upon proof of physical facts clearly inconsistent therewith. If the evidence adduced is such as to leave room for no other reasonable inference than that of suicide, the jury can not lawfully return a verdict to the contrary. . . Where all the testimony relating to a certain question excludes every reasonable inference but one, the issue is resolved into a question of law and may be determined by the court as such." InNew York Life Insurance Co. v. King, 28 Ga. App. 607,610 (112 S.E. 383), it was said: "The plaintiff offered no witness nor any evidence of any kind to show the cause of the death of Robert A. Coleman, or how the wound on him was inflicted, and it follows that the verdict rests solely upon the legal presumption *Page 568 
against suicide, and in the present case the only support for this presumption is mere conjecture which is unsupported by any evidence of any character. In the decision of the Supreme Court in the case of Jenkins v.National Union, 118 Ga. 587 (45 S.E. 499), it was said: `We think it indubitable that when a contract of insurance provides that the policy shall be void in the event the insured shall commit suicide within a certain time, "whether at the time of committing suicide [the insured] shall be either sane or insane," the meaning is that, regardless of his sanity or insanity, the voluntary self-destruction of the insured within the time set out shall void the policy.' In TravelersInsurance Co. v. Sheppard, 85 Ga. 751 (12 S.E. 18), the presumption against suicide was stated thus: `Where the fact of death is established, and the evidence points equally or indifferently to accident or suicide as the cause of it, the theory of accident rather than of suicide is to be adopted.' And it is universally held that the defense that the insured committed suicide must be established by a preponderance of the evidence, but that the presumption against suicide easily yields to physical facts clearly inconsistent with it. Hodnett v.AEtna Life Insurance Co., 17 Ga. App. 538 (87 S.E. 813). The case last cited is very much like the one at bar in its facts and the inferences therefrom. Of course, if there is no evidence as to the cause of death, it will be presumed that the death is from natural causes. But the principle may be carried still further, and it may be regarded as a settled rule that, when the circumstances of the death are such that it might have resulted from negligence, accident, or suicide, the presumption is against death by suicide. This rule is stated [in 14 Cooley's Briefs on Insurance, 3255.] But it is well established that the fact of death by accident is not to be established by conjecture or presumption, unless there is no evidence whatever as to the cause of the death. The presumption of death by accident is prima facie only and is rebuttable, and, as said by several of the decisions, easily rebuttable by physical facts in evidence, and this presumption prevails only when the cause of the death is unknown. It does not prevail where there are facts bearing upon the question whether the death was intentional or accidental. When evidence is produced which is contrary to such a presumption, or the presumption is met by a conflicting presumption, it disappears, although the fact upon which it rests may still *Page 569 
remain proper to be considered in arriving at a conclusion. As was well expressed by the Court of Appeals of Missouri: `Where the facts appear from which the issue of accident or suicide might be determined, then all presumptions, such as the love of living, and against suicide, are out of the case, and a plaintiff will not be entitled to recover and bolster up the case on such presumption where the facts of the tragedy are introduced in evidence.' Thompson v. Business Men's Accident Ass'n of America, 231 S.W. 1049. It has been repeatedly held by various courts, in discussing this question, that the issue as to the cause of death must be proved, like any other fact in a civil action, by a preponderance of the evidence on the question. Modern Woodmen of America v. Craiger, 175 Ind. 30 (92 N.E. 113, 93 N.E. 209). As stated in several cases on the point, the law does not prescribe any formula by which the hypothesis of accident must be removed; it is sufficient that it is met by evidence, where there are no facts or circumstances shown indicating accident or mistake, and facts and circumstances are shown which establish that the cause of death was suicide. `Men do frequently commit suicide. It is one of the multitude of legitimate inference, in which we infer the unknown from the known, having greater or less degrees of probability, which we use in reasoning to arrive at the ultimate fact. Being a probability based upon human experience, in its nature, it is controlling only in the absence of evidence of the actual.' Grosvenor v. Fidelity 
Casualty Co., 102 Neb. 629 (168 N.W. 596). In other words, in its essential analysis the question we are discussing should be proved like any other fact. There should be nothing peculiar or exceptional in the method of proof. . . As against the mere conjecture, the slightest evidence of physical facts becomes strong, even conclusive." Certainly the physical facts and circumstances stated in the foregoing part of against suicide, and require by their preponderances, and the absence of anything even remotely suggesting death by accident, natural causes, or the act of a third party, the conclusion that the insured came to her death as the result of the intentional taking of strychnine poison. The court erred in overruling the motion for new trial on the general grounds.
3. The first special ground complains that the court erred in excluding from the jury the testimony of a witness (who had *Page 570 
stated that he refused to sell the insured some strychnine) that "I just felt like she wanted to kill herself." This statement amounted only to a belief on the part of the witness; and being prejudicial, as contended by counsel for the plaintiff in urging that it be stricken, was properly excluded by the court.
Another ground complains of an excerpt from the charge of the court which, it is contended, amounted to an instruction that the jury were not to consider any of the testimony of a certain witness on the question whether or not the insured took strychnine. This contention is without merit. Properly construed, as no doubt the jury understood it, the language to which exception is taken referred only to the excluded statement of the witness, a druggist, as to his belief that the insured "wanted to kill herself."
Several grounds complain that the court erred in stating the contentions of the defendant as to the cause of death of the insured, in that the court charged that it was the defendant's contention that the insured "intentionally committed suicide," whereas it is averred that the defense set up was that she intentionally took strychnine (as distinguished from an accidental taking), but was not limited to the contention that she was sane at the time of her act, but that there could be no recovery if she died by her own hand or act, whether sane or insane; that the court likewise erred in instructing the jury that "intentional suicide voids an insurance policy," and in other parts of the charge using the words "intentionally commit suicide," "intentional suicide," etc. The certificate provided that it should be void and of no effect "if the member holding the certificate . . should die . . by her own hand or act, whether sane or insane." "The words `die by his own hand or act,' as used in a life-insurance policy, are in general synonymous with `voluntary suicide,' and convey the idea of intentional self destruction; but where with such words is coupled the provision `whether sane or insane,' it is immaterial whether the insured at the time of the self-destruction was sane, or whether his `mental faculties were so impaired as to destroy his moral responsibility.' [Citing.]" Bullard v. Metropolitan Life Insurance Co.,31 Ga. App. 641 (2) (122 S.E. 75). However, the defendant did not in its answer fully avail itself of the defense it might have urged under the provision of the certificate, but set up that the insured "died on April 14, 1939, as the result of intentionally taking strychnine, *Page 571 
and that the cause of her death was suicide by strychnine self-administered." The self-destruction of one who is at the time insane is not legally suicide.Mutual Life Insurance Co. v. Durden, 9 Ga. App. 797
(5) (72 S.E. 295). Hence, the contention of the defendant "that the cause of her death was suicide by strychnine self-administered" must be taken to mean that the insured was sane, as otherwise it could not be said that her act was "legally suicide." Of course, under the contract it would, as to non-liability of the defendant, be immaterial whether the insured was sane or insane if she intentionally took strychnine and died as a result thereof; but it is clear that the defendant limited its defense to the contention that she intentionally took strychnine but took it while she was sane, and thus by her act committed suicide. While the burden rested on the defendant to overcome by a preponderance of the evidence the presumption against suicide, it was not necessary for the defendant to prove that the insured was sane. The law presumes every person to be sane at the time of the commission of an act of self-destruction. Mutual Life Insurance Co. v. Durden,
supra; Merritt v. Cotton States Life Insurance Co.,55 Ga. 103. The language of the court was not error for the reason urged by the plaintiff in error.
Another ground complains that the court erred in reopening the case and, over the protest of the defendant, allowing a witness for the plaintiff to testify after the case had been closed and motions argued by both parties for direction of a verdict, all of the witnesses for the defendant having been excused and having left the court, and being unavailable to the defendant. The case was reopened to permit a witness to testify for the purpose of explaining or rebutting certain statements made in the proofs of death. It is averred by plaintiff in error that one of its witnesses, who had been at court and could rebut the testimony of the witness for whose testimony the case had been reopened, had gone to her home in another county, was not under subpoena, and was not available after the reopening of the case. Counsel for plaintiff informed the court that he had no objection to counsel for the defendant stating in open court what the absent witness would testify if present; whereupon counsel for the defendant made a statement in that respect, still objecting, however, to the court's permitting the case to be reopened. It is stated, in effect, by counsel for movant *Page 572 
in their brief that they think the witness would have given more favorable testimony, if present, than counsel were willing to represent that she would; and it is contended that the court erred in reopening the case under these circumstances and permitting the plaintiff's witness to testify. In reopening a case for the introduction of additional evidence the trial judge is vested with a wide discretion, the exercise of which will not be disturbed except where it is manifest that such discretion has been abused. Counsel for the defendant was permitted to state fully what testimony might be expected from his absent witness. A mere opinion or surmise that the witness would have given, on behalf of the defendant, more testimony than counsel was willing to represent would be adduced does not show that the privilege granted counsel was not sufficient justification for the admission of the testimony of the plaintiff's witness. No abuse of discretion is shown, and this ground is without merit.
Judgment reversed. Felton, J., concurs specially.