# Richmond

## CATHERINE L. HARLESS, ADM'X, ET AL. V. ATLANTIC LIFE INSURANCE COMPANY.

October 13, 1947.

Record No. 3231.

Present, *Hudgins, C. J., and Gregory, Eggleston, Spratley and Buchanan, JJ.

*Note.—Former Chief Justice Holt sat during the argument of this case and before his death concurred in this opinion.

The opinion states the case.

*John D. Easley* and *James S. Easley*, for the plaintiffs in error.

*Williams, Robertson & Sackett* and *A. B. Scott* for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

In this suit on a life insurance policy to collect double indemnity for accidental death, the trial court struck out the plaintiffs' evidence on the ground that the insured committed suicide. The jury thereupon returned a verdict for the defendant, upon which judgment was entered, and this writ of error tests the validity of the court's action.

The insured was Thomas E. Harless. The plaintiffs are his administratrix, who was his mother, and Burnett, to

whom the insured had assigned the policy as security for a debt.

The policy was dated December 18, 1945. It was for $5,000, payable to the estate of the insured, with a provision that if the insured should die by his own act within two years, the liability of the company should not exceed the premiums paid, and with a double indemnity agreement to pay an additional $5,000 if the death of the insured resulted from bodily injury effected through external, violent and accidental means, and, among other things, did not result from violence intentionally inflicted by another, or from suicide.

The plaintiffs brought suit by notice of motion alleging that on the 25th of February, 1946, Harless died by external, violent and accidental means; that is, "by a bullet accidentally fired from a pistol passing through the head of the said Thomas E. Harless," by reason of which $10,000 had become payable under the policy, payment of which the company had refused.

The defendant relied on three grounds of defense: (1) that Harless had committed suicide; (2) that he had made material misrepresentations in applying for the policy; and (3) that the plaintiffs had failed to prove that his death was accidental. The trial court overruled the defendant's motion to strike the evidence of the plaintiffs at its conclusion, but sustained a similar motion at the end of all the testimony. That was done, the trial court said, because the circumstances shown in evidence were sufficient "to overcome the burden which was placed upon the defendant to show (suicide) by clear and satisfactory evidence, and to the exclusion of any reasonable hypothesis consistent with death from natural or accidental causes," and if the jury should return a verdict for the plaintiffs he would have to set it aside.

In stating the measure of proof required, the trial court followed the case of *Life Ins. Co.* v. *Brockman*, 173 Va. 86, 3 S. E. (2d) 480, in which instructions were approved which told the jury that "where circumstantial evi-

dence was relied upon to establish suicide, as a defense to an action on a life insurance policy, the law presumed that death resulted from a natural cause, and that the burden was upon defendant to establish suicide by clear and satisfactory evidence to the exclusion of any reasonable hypothesis consistent with death from natural or accidental causes." (173 Va. 93).

The defendant here urges that "the extreme rule in Virginia should be clarified and modified" because it is confusing and creates "an unhappy and unsatisfactory situation." A similar argument was made by the defendant in the *Brockman Case* and rejected, with the statement that "the principles involved in the instruction(s) given are supported by a long line of Virginia decisions," and "these principles have become the settled doctrine in Virginia." (173 Va. 93, 94).

We are. not persuaded that this settled doctrine should now be unsettled. It is clear enough in its terms. Its application need not create an unhappy and unsatisfactory situation. If it makes for an unhappy litigant, that is not an unusual result with any rule, and a different rule would. not likely avoid that result. It is a rule that has been followed by many courts, though rejected by others. See annotation following *Jefferson Standard Life Ins. Co. v. Clemmer* (4 Cir., 79 F. (2d) 724), 103 A. L. R. 171, 185. Practically all courts recognize a legal presumption against suicide. They differ on the quantum of proof necessary to overcome the presumption and on whether the presumption should be given the force of evidence. It is no rare thing to require different degrees of proof to establish different facts. Proof of guilt must be beyond reasonable doubt; proof of fraud or unlawful act, or undue influence, and many others, must be clear and satisfactory, or clear and convincing (*Virginia Fire, etc., Ins. Co.* v. *Hogue*, 105 Va. 355, 54 S. E. 8; *Rudlin* v. *Parker*, *ante*, p. 647, 43 S. E. (2d) 918; Wigmore on Evidence, 3d Ed., sec. 2498, pp. 329 *et seq.*).

The evidence here is to be tested by the rule established

by our cases. If it is clear and satisfactory, and reasonable men should not disagree that it excludes every reasonable theory of death by accident, the action of the trial court was correct.

Harless, the insured, was twenty-nine years old at the time of his death. He was married in 1938. That marriage was not successful. During its existence he drank a great deal; there was trouble over other women; he kept and frequently handled guns and pistols; he used a pistol to force his former wife to give him a letter written to him by another woman, and again to force her to drive him in a car where he wanted to go. She divorced him in 1944 on the ground of adultery. He saw her occasionally after the divorce. About a month before his death he came to Lynchburg to attend his grandmother's funeral. He then sought out his former wife, was with her for several hours, and was drinking. He told her that he had ruined his life and it was too late for him to turn back, and that he was suffering then for what he knew she must have gone through with two years before. He said he did not have any reason not to drink; that he would straighten up for a while, get on his feet, and then he would not see any reason to keep on.

A few months before his death he met and began an affair with Catherine Staton, nineteen years old, who was married when Harless met her but was afterwards divorced by her husband. Very soon after she and Harless met she moved into a house owned by him in Lynchburg. She drank with him, took trips with him and obviously lived with him. She was in a car with him in October, 1945, in Amherst county when they had a wreck and he was arrested and convicted for driving while drunk. She said they planned to get married, but her divorce had not become final when she last saw him on the day of his death.

February 13, 1946, less than two weeks before his death, she wrote to him in Fayetteville, N. C., telling him she could not come down there that week-end, and saying:

"Tommy, when I told you the other night that I was

going to get married. I am supposed to. Honest I am. You remember I told you to stop drinking. But you didn't do it.

"Tommy, if I was you I would come in this week and stay out to Carlton Nash and try to straighten out everything. Everyone is calling Less saying you owe them money. I'm not going to try to tell you what to do. But you had better come in and straighten things out. It's time for me to go to work now. So I'll be closing. Take good care of yourself. And I'm really sorry about everything, Tommy. Love, Kitty."

Whether because of that letter or not, he came back to Lynchburg on Friday, February 22, 1946, and rented a cabin at the Old Fort hotel, a tourist place just outside of Lynchburg. The first time she saw him was Saturday night downtown in a car, but she did not talk to him. He had come to her house that night but she did not see him. She had an engagement with him for Sunday night, made when he came back to her house Sunday, but she did not see him that night because she went to Charlottesville and did not get back in time. She next saw him about noon Monday—the day of his death.

After Harless registered at Old Fort Friday night, he was seen there that night by Austin, an employee, and was then drunk. No witness saw him again there until Monday. On Monday, February 25, about nine o'clock in the morning, Harless hired a cab to take him into Lynchburg, where he purchased a bottle of whiskey, and then drove to the home of Miss Staton. She came back with him to the cabin about noon and stayed there until about six o'clock that evening. About that hour she came to the central building of the camp and engaged Austin to take her home in his cab. Harless followed her to the cab, grabbed her and tried to keep her from leaving him, and when he failed in this he got into the cab with her. He was then without coat or hat and was drinking. On the way he tried to persuade the taxi driver not to take her home. When they arrived at her destination she went into the house and he came back to

the cab. He directed the driver to take him to a place on Harrison street where Harless got out, was gone three or four minutes, got back into the cab and had the driver take him to his cabin at Old Fort. It was then near seven o'clock in the evening.

The Harrison street visit was important in the sequence of events. About five o'clock Sunday afternoon Harless had left his automobile there with Mr. Webb to be repaired. He owed money on the car and payment was overdue. Barbieri and Turner, agents of the creditor, came to Webb's Monday afternoon about four-thirty to take possession of the car, and Webb called Harless at the cabin and Harless said to tell them to come over to see him. He sounded mad. They went and he gave them a check for the balance due. After the visit to Harless, Barbieri came back to Webb's about five forty-five or six o'clock, took out of the car a pistol that he found in it either then or on his previous visit (the record does not show which), broke it down and took out its five shells, and then put the pistol back in the glove compartment, locked it and took the key away with him. Webb said he also put the shells in the glove compartment with the pistol. Barbieri said he put them in his pocket and carried them away and there were then no other shells in the glove compartment. This was a pistol without handles (or rather the usual side pieces were missing from the grip or butt), and was identified as the pistol from which the bullet came that killed Harless an hour or so later.

Between 6:30 and 6:45 p.m., or about that time, on Monday evening, a little more than an hour before Harless was found dead (and evidently quite soon after Austin brought him back to the cabin), Mawyer, a boy of sixteen, who had been a close friend of Harless' for about eight months, and who had heard that Harless was at Old Fort, called him by telephone and asked him to come over to Mawyer's. Harless replied that he had nothing to drive and asked Mawyer to come over there. Mawyer replied that he would get a cab and Harless said, "If you do, come by and get

Kitty." Mawyer asked what to do if they would not let him have her and Harless replied that they would then go over and find out "why the hell they don't."

Mawyer went to Miss Staton's but could not get in touch with her, and then drove on to the cabin at Old Fort, arriving there about eight o'clock. He knocked, got no reply and walked in to find Harless dead on the bed with the pistol in his hand. He went for McMasters, the manager; the sheriff came about nine o'clock and the coroner about twelve. Nothing was moved in the room until after the coroner made his examination. There was no conflict in their testimony on any material point, except McMasters said there was a bullet hole through the counterpane and sheet, but not into the mattress. He said he saw it when they were searching for the bullet and picked the covers up after the body had been moved, and he did not know whether the body was lying where the hole was or not. He did not examine them closely but there were several holes in the sheet and counterpane. The sheriff and coroner said that they did not see any bullet hole in the bedclothes.

The room Harless was in was in a brick cabin with a solid wall between it and the room in the other end. When Mawyer came the door into the room was closed, but not locked; the light was on, the windows were closed and there were screens over them that did not raise. The room was in no disarray, the furniture was in order and there was no evidence of any struggle. The bed looked like somebody had been in it for sometime and the bed covers were "all balled up on the bed, kind of under him." An empty liquor bottle, and another, a fifth, with about two inches of whiskey in it, were on the dresser. A desk telephone that usually sat on the dresser was on the floor some two feet from the feet of Harless.

Harless was lying on his right side on the bed with his right arm under his body; the pistol was lying in the palm of his left hand, the fingers of which were slightly flexed. The coroner said the part of the pistol that was in his hand was "the part of the revolver that anybody would catch

hold of to fire it," "laying on his hand just as if his hand was relaxed," and "he just tumbled over on the bed sideways like this (indicating), with his feet on the floor."

Harless was left-handed and was accustomed to shooting with his left hand. The pistol in his left hand was a .32 caliber revolver with four loaded shells in the cylinder and one empty shell in the firing position. The entrance point of the bullet was on the left side of his head an inch in front of his ear and just about an inch above, and there was a little smudge or dark discoloration there that could be wiped off with a cloth, which the coroner said "seemed to be just the smudge of the blast of a gun." And the hand which held the gun was dark "just about like the stuff that was on the side of his head." The bullet had emerged on the right side of his head about one and one-half inches behind his right ear and about two and one-half inches above the ear; that is, the bullet went through his head slightly backwards and upwards. As stated, the pistol was the one that Barbieri had locked up in Harless' car an hour or so before Harless died.

Search was made in the room that night for the bullet, but it was not found. A battered bullet was found next day under the radiator six or seven feet from the bed. There were no bullet holes in the walls, but McMasters testified he saw a fresh place in the plaster wall five or six feet from the floor right over the bed, and between the door and the head of the bed, but he did not know whether the bullet made the place or not.

There was evidence from Miss Staton that Harless had said that if the car ever turned over and killed him it would be nothing gone; and Mawyer heard him say he hoped he would have an accident and kill himself, and on two occasions that if he did kill himself it would be another damn fool gone. Both of these witnesses stated, however, that he said these things in a joking way.

There was other evidence that Harless was in financial straits, or at least pressed for funds. On Saturday before his death, a distress warrant was levied on some property

of his in a filling station near his cabin. He owed Mahanes, a witness, about $450, and Mahanes was writing him urging payment and threatening attachment. To prevent repossession of his car he gave the agents of the automobile company a check for $817.50 on a Baltimore bank, without sufficient funds in the bank to cover it. In the appraisal of his estate only $5.52 is shown to have been on deposit in that bank. After his conviction for drunk driving, he sold the trucks which he had owned and used in a delivery business in Lynchburg and moved to Maryland, where he operated a taxi-cab around Camp Meade.

The evidence recited is without contradiction in any essential detail. The only countervailing evidence is some testimony to the effect that Harless did not appear to be abnormal immediately before his death and that there was nothing about his talk or manner that indicated a purpose to take his life; that generally he was a man of happy disposition who liked a good time, was popular and not given to worrying; that his financial embarrassments were of a petty nature, and that he was financially solvent and possessed of good health and a capacity to work and make money.

But, as his friend Mawyer said, that was the way it seemed to be on the outside, "on the inside I don't know." There can be no doubt under the evidence that he was a frequent and heavy drinker. He was a frequenter of roadhouses and often in trouble with the law. He was quick-tempered, easily offended, very nervous and a very fast driver. Over a little misunderstanding he had shot at Mahanes and was convicted for it. The proprietor of a dance hall on the Amherst road had forbidden him to come into his place because of drinking and disorderly conduct and attempting to shoot a woman in his car out front. The evidence shows him to have been a reckless and dissolute young man, who in the conversation with his former wife seemed to see the end of the road he was traveling, and to have some feeling of regret and despair about it. He had wrecked his first marriage by his infidelity. He was living an immoral life with another woman who had just

left him in spite of his efforts to keep her, and who had written him she had told him to stop drinking and he would not, and now she was going to get married. She said she did not mean that, but if so it does not follow that he knew she did not. The circumstances detailed could have had for him a different meaning.

There is no reasonable doubt that after he left her at her home he came back by Webb's, got the pistol that was in the glove compartment of his car, reloaded it then or afterwards, and brought it to his room. For what purpose? Not to repair it, or clean it, because there was nothing in or about the room to indicate that he was doing or intended to do either of those things. It is not reasonable to think he would have loaded it for either of those purposes. It is admitted by the pleadings and shown by the proof that he was not murdered. There is not the slightest evidence to indicate that the pistol fired as the result of an accident. The position of the body, the way the pistol rested in his hand, the position of the wound and the course of the bullet through his brain, coupled with his background and the attendant circumstances, exclude every reasonable theory of death by any other means than suicide.

Plaintiffs say in their brief that it is apparent from the facts "that suicide is possible and probable, and we might go so far as to assume, for the sake of argument, that suicide is more probable than accident; nevertheless, this is not sufficient in law."

█ If the probability of suicide is of such degree as to make the theory of accident an unreasonable theory, then it is sufficient, and the jury would be required so to find, and the court would have to set aside any other verdict. In that situation it would be the duty of the court to strike out plaintiffs' evidence.

█ The presumption against suicide is not a conclusive presumption. It is necessarily a rebuttable presumption, else suicide could not be proved in any case by circumstantial evidence. The evidence to overcome the presumption does not have to exclude the possibility of accident. It has only

to exclude the reasonable theory of accident. If no reasonable theory of accident exists under the facts and circumstances shown by the evidence, then the presumption logically and legally falls. It cannot stand in the presence of evidence sufficient to show that the presumption is contrary to the truth. Evidence is sufficient to show that, under our rule, when it excludes every reasonable hypothesis of death from any other cause than suicide. (Cf. *Kavanaugh* v. *Wheeling*, 175 Va. 105, 7 S. E. (2d) 125; *In re Findlay*, 253 N. Y. 1, 170 N. E. 471).

It is unnecessary to extend this opinion by a discussion of whether the presumption against suicide is itself evidence, or only a rule of law affecting the burden of proof. For discussions of the subject see *New York Life Ins. Co.* v. *Gamer*, 303 U. S. 161, 58 S. Ct. 500, 82 L. Ed. 726, 114 A. L. R. 1218, and note; *Jefferson Standard Life Ins. Co.* v. *Clemmer, supra; Provident Life, etc., Ins. Co.* v. *Prieto*, 169 Tenn. (5 Beeler) 124, 83 S. W. (2d) 251; *McDaniel* v. *Metropolitan Life Ins. Co.*, 119 W. Va. 650, 195 S. E. 597.

As said by Judge Parker in *Gorham* v. *Mutual Ben. Health, etc., Ass'n*, 4 Cir., 114 F. (2d) 97, 99: "and even if the presumption against suicide be accorded the weight of evidence, it must be considered along with the other evidence in the case; and, if upon the evidence viewed as a whole, there is no room for doubt as to the fact in issue, verdict must be directed."

And in the same case (p. 100); "A suicide case should be tried like any other case, and metaphysical reasoning about presumptions and burden of proof should not be permitted to obscure the real issue, as has been done in so many cases. If the evidence is conflicting, or if different inferences can reasonably be drawn from it, the case is for the jury. If, however, the evidence is so clear as to leave no room to doubt what the fact is, the question is one of law, and it is the right and duty of the judge to direct a verdict."

In a case depending upon the sufficiency of evidence, other cases are not particularly helpful because their facts are different. We think the evidence in this case readily

distinguishes it from cases like *South Atlantic Life Ins. Co. v. Hurt*, 115 Va. 398, 79 S. E. 401; and *Metropolitan Life Ins. Co. v. DeVault*, 109 Va. 392, 63 S. E. 982.

Any theory here but that of suicide would have to rest on pure speculation or conjecture. A verdict with nothing more to rest upon than imagination or suspicion is an unjust verdict and courts should not be so blinded by a rule of evidence that they are unable to see what is plain to everybody else. The trial judge ventured the statement that "There isn't a person who heard this case, and there isn't a person who knows anything about the facts of this death, that doesn't believe that he committed suicide." That might well be true in the light of the evidence.

In this view it becomes unnecessary to discuss the other two grounds of defense relied on by the defendant.

The judgment complained of is

*Affirmed.*