# Richmond

## Frances Kirby Atkinson v. The Life Insurance Company of Virginia.

September 2, 1976.

Record No. 751127.

Present, All the Justices.

*Evans B. Jessee* (*Arthur E. Smith*, on brief), for plaintiff in error.

*C. Thomas Burton, Jr.* (*Kenneth E. Trabue; Hunter, Fox & Trabue*, on brief), for defendant in error.

I'Anson, C. J., delivered the opinion of the court.

Frances Kirby Atkinson, plaintiff, brought this action against The Life Insurance Company of Virginia (insurer) to recover as beneficiary under the accidental death provisions of a life insurance policy issued to her husband, Darrell Lee Atkinson (decedent or Atkinson).[1] The case was tried without a jury, and the trial judge, in a letter opinion, found that Atkinson's death was not caused by accidental means, as contended by the plaintiff, but resulted from self-destruction or self-inflicted injury within the terms of one of the policy exclusions. Judgment was accordingly entered for the insurer.

Section 6, Part B, of the insurance policy, as relevant here, provides:

"[I]f any employee, while insured hereunder for accidental death . . . shall have sustained bodily injuries solely through violent, external and accidental means, and . . . shall have suffered [death] . . . the Company will pay, subject to the terms and limitations hereof, the amount of the insurance specified . . .; provided, however, that in no case shall any payment of accidental death . . . insurance be made for death . . . resulting directly or indirectly, wholly or partially from:

"(1) Self-destruction or self-inflicted injury, while, sane or insane. . . ."

The evidence shows that on November 19, 1971, Atkinson, an employee of the Wythe County School Board, was admitted to Roanoke Memorial Hospital for treatment of regional enteritis, an inflammatory bowel disease. Surgery was performed on December 10, 1971, and he was thereafter placed in a room on the eighth floor of the hospital. Atkinson progressed normally from the surgery until December 15, 1971. During that day it was noted that Atkinson appeared confused and began hallucinating. He told his nurses, physicians, and wife that he was being gassed by the hospital staff. He believed the gas was coming through the vents in his room. His condition was diagnosed by his physician as toxic psychosis. Body restraints were applied to prevent decedent from getting out of his bed, and he was given medication to quiet him. Approximately 4:00 o'clock the next morning, Atkinson telephoned his wife and asked her to come and get him because "they were gassing him and trying to kill him." At that point, a nurse came into his room, took the telephone receiver, told the wife that he was confused and not to worry about him.

Atkinson was last seen alive just before 7:00 a.m. Shortly thereafter, he was discovered dead, lying on the ground outside of the hos-

---

1. The company had paid plaintiff the face amount of the policy.

pital under an open window to the eighth story stairwell. The evidence shows that the window was closed when seen about five minutes before the decedent's body was discovered. Decedent's hospital gown was found on a radiator in the stairwell. Photographs showing the location of the window and radiator were introduced in evidence.

An examination of decedent's room showed the bed restraints were still intact. A trail of blood extended from his room, down the hall, into the stairwell, and onto the radiator and window sill.

Decedent's physician testified it was his opinion that Atkinson went out of the window of his own volition, because he feared he was being gassed or "done in" by the hospital staff, and he wanted to escape this imaginary peril.

Plaintiff contends that decedent's death was caused by violent, external, and accidental means, while insurer argues that death was by self-destruction.

■ A beneficiary under an accident policy, or a double indemnity clause of a life policy, has the burden of proving that injury or death was caused by violent, external, and accidental means. When the evidence presented shows, as here, that an insured's death was caused by violent and external means, a presumption arises that death was accidental. There is also a presumption against suicide. However, both presumptions are rebuttable and may be overcome by "clear and satisfactory" evidence which excludes "any reasonable hypothesis consistent with death from natural or accidental causes." *Life and Casualty* v. *Daniel*, 209 Va. 332, 341, 163 S.E.2d 577, 584 (1968).

■ The issue, under the evidence presented here, turns upon the meaning and applicability of the clause in the policy excluding recovery if death results from "self destruction or self inflicted injury, while sane or insane." This is a question of first impression in Virginia, and decisions in other jurisdictions are not harmonious.

Plaintiff argues that consciousness of the physical nature and consequences of the act and an intention by an insured to kill himself must be shown before the exclusion clause of self-destruction or self-inflicted injury, while sane or insane, can be invoked. She relies on *Christensen* v. *New England Mut. Life Ins. Co.*, 197 Ga. 807, 30 S.E.2d 471 (1944). For other authorities supporting plaintiff's argument see Annot., 9 A.L.R.3d 1015, 1025-32 (1966), and the cases there collected.

In *Christensen*, the Court of Appeals of Georgia certified to the Supreme Court of that state the following question:

"Where a life insurance policy provides as follows: 'Suicide. If the insured, whether sane or insane, shall die by his own hand or act within two years from the date of issue of this policy, the liability of the company under this policy shall be limited to the payment in one sum of the amount of premiums paid, less any indebtedness to the company.' Is the company liable for the face amount of the policy, where it would be liable therefor unless the above quoted provision became applicable, where the insured, within two years from the date of the issue of the policy, comes to his death by jumping from a sixth story window of a hotel and landing on the roof of another part of the hotel forty-three and one half feet below, when the insured, by reason of an hallucination, jumped to escape injury from imaginary enemies and did not realize that his act would as a natural consequence produce his death?"

The Supreme Court answered the question by holding that, where an insured did not realize the physical nature and consequences of his act, and did not intend thereby to take his own life, his act did not constitute self-destruction, while sane or insane within the meaning of the exclusion clause of the policy. In so holding the court rejected the reasoning of the majority in *De Gogorza* v. *Knickerbocker Life Insurance Co.*, 65 N.Y. 232 (1875) and followed the dissent there.

However, a strong dissent was filed in *Christensen*. We think it appropriate to quote a portion of it here:

"Therefore, the question is, where one laboring under an hallucination and in order to escape an imaginary peril commits an act which to a sane person would naturally result in his death, but which to the insane mind would not and did not suggest the natural consequences but did in fact result as a natural consequence in his death, does the contract provide that he, as an insane person, is to be held accountable for the natural consequences of his act just as though he were sane? We think that it does, else the provision of the policy as to insanity is without effect, and the floodgates are left wide open for fraud. . . . Thus, whether sane or insane, the act was still the exercise of volition, and under the terms of the policy he is held accountable for his voluntary act just as though he were sane."

The numerical weight of authority supports the view that in order for an insurer to avoid liability under the exclusion of death from self-destruction, while sane or insane, it is not necessary for the insured to

realize the physical nature or consequence of his act or to form a conscious purpose to take his life. If the act of self-destruction would be regarded as suicide in the case of a sane person, it would be so treated as to an insane insured, regardless of whether the insured decedent realized or was capable of realizing that such act would cause his death or whether he was capable of entertaining an intention to kill himself. Among the cases supporting this rule are: *Bigelow* v. *Berkshire Life Ins. Co.*, 93 U.S. 284 (1876); *Johnson* v. *Metropolitan Life Ins. Co.*, 404 F.2d 1202 (3d Cir. 1968); *United States Fidelity & G. Co.* v. *Blum*, 258 F. 897 (9th Cir. 1919); *Aetna Life Ins. Co.* v. *McLaughlin*, 380 S.W.2d 101, 9 A.L.R.3d 1005 (Tex. 1964); *Moore* v. *Northwestern Mutual Life Ins. Co.*, 192 Mass. 468, 78 N.E. 488 (1906). *See also* Annot., 9 A.L.R.3d 1015, 1032-40 (1966) and the cases there collected; 9 Couch on Insurance (2d), § 40:42 at 673-674.

In *Aetna, supra*, the court said:

> "In our opinion, the minority rule would lead to confusion and attempts by courts to define varying degrees or aspects of insanity. . . . The broader exclusion afforded to the exclusionary clause by the majority rule is in no way obnoxious to public policy. . . . [F]urther, and of most importance, we think the majority construction gives to the clause in the light of its history, a plain common sense meaning of the words employed." 380 S.W.2d at 106, 9 A.L.R.3d at 1013-14.

In *Blum, supra*, the court said:

> "If the insured fell out of the window by accident or in a faint, and was killed by the fall, of course there could be a recovery. But if he, of his own physical motion, went through the window and so destroyed himself, then under the contract, the insurer can avoid liability, and it would matter not what the mental condition of the insured was. The effect of the qualification to the instruction quoted was a direction that, although death may have resulted from the physical act of going through the window, suicide could not be found unless the deceased intended to kill himself, and knew his act would probably result in death. And this we hold was a material error." 258 F. at 901.

We think the better rule is the one adopted by the numerical majority of the courts dealing with the issue presented here.

In the case at bar, the trial court, as the trier of fact, found that the presumptions favoring accidental death and against suicide were over-

come by the evidence. The court's findings of fact are supported by clear and convincing evidence that decedent's death was not caused by accidental means, but by self-destruction or self-inflicted injury while laboring under a mental aberration, although decedent did not actually intend to take his life. The trial court was justified in concluding from the evidence that Atkinson, in order to escape an imaginary peril, extricated himself from the bed restraints, left his room, went down the hall to the stairwell, took his hospital gown off, placed it on the radiator, and purposely and by his own volition went through the open window, which caused his death. The plain language of the exclusionary clause comprehends all purposeful self-destruction whether the suicidal act shall emanate from a sane person or one suffering from a mental aberration. Thus, it was not necessary that Atkinson comprehend the consequences of his act and intend to take his life in order for his death to come within the self-destruction exclusion.

For the reasons stated, the judgment is

*Affirmed.*

HARRISON, J., dissenting.

The majority has failed to accord the wife-beneficiary the presumptions to which she is entitled. It was shown that Atkinson's death was caused by violent and external means. This having been established, presumptions arose that the decedent's death was accidental and was not suicidal. The burden was on the insurer to establish suicide by clear and satisfactory evidence to the exclusion of any reasonable hypothesis of accidental death. *Life & Casualty* v. *Daniel*, 209 Va. 332, 163 S.E.2d 577 (1968); *Harless* v. *Atlantic Life Ins. Co.*, 186 Va. 826, 44 S.E.2d 430 (1947); and *Life Ins. Co.* v. *Brockman*, 173 Va. 86, 3 S.E.2d 480 (1939).

Atkinson was hallucinating and laboring under the delusion that the doctors and nurses were trying to keep him from seeing his wife; that they were gassing him through the various tubes in his body and by the air vents in his room; and that there were bugs crawling on his bed. The decedent had never previously manifested any suicidal tendencies or had any known reason to commit suicide. The entire thrust of Atkinson's conversations and actions was that of a man concerned with his self-protection and his self-preservation. In freeing himself from the body restraints he tore out the tubes which had been inserted in his body. This accounts for the trail of blood from the bed to the window. There were no eyewitnesses to the accident, and

there was no evidence of how it occurred. It is as reasonable to believe that decedent was seeking fresh air to rid his system of the imaginary poisoned gas, and that in his weakened condition he fell out of the window, as it is to believe that he "purposely" and by his own "volition" went through the open window. The trial judge found as a fact "that the decedent did not actually intend to take his own life".

The only factual basis assigned for the majority opinion is that "[d]ecedent's physician testified it was his opinion that Atkinson went out of the window on his own volition. . . ." The following extracts from the testimony of this physician, Dr. Harry Robert Yates, Jr., do not support that premise. Dr. Yates testified:

> "He was getting along reasonably well, as far as people with this disorder do, post-operatively until the evening prior to his death, when the nurses reported that he was acting bizarrely and as was described, he was hallucinating and was really terrified at these things that were trying to get at him or the fact that he was being gassed, that there was something dreadful about to happen to him.

\* \* \* \* \*

> "This, [referring to the toxic psychosis] in turn, I think, made him not capable of reacting in a normal way and whatever this dread thing was that was after him, I think he was doing his darndest to get away from it.

\* \* \* \* \*

> "The *fall* was the cause of his death.

\* \* \* \* \*

> "Well, I think, [as to whether Atkinson jumped from the window of his own volition] if I can put it in what I think may be, I think he was trying to get away from something. *He was not aware that he was on the eighth floor. Perhaps he thought he was on a ground floor somewhere,* and I will just climb out this window, and *it turned out the window was eight stories above the ground.*

\* \* \* \* \*

> "[H]e was not rational the last time I saw him. I don't think he knew where he was.

\* \* \* \* \*

> "That is true. [that Atkinson may have known or may not have known that he was on the eighth floor.] It would be analogous to

me that if someone were chasing you and say was threatening you with a knife, and you were running along the edge of a mountain, and you looked back to see if the guy was gaining on you, and you ran off the cliff—I am not sure you wanted to jump off the cliff, but you went off anyway.

\* \* \* \* \*

"*I don't know whether he jumped or not.* I think he went out of the window to escape whatever this thing was. [This answer given in response to the question whether Mr. Atkinson purposely jumped in order to escape the consequences of an imaginary peril.]

\* \* \* \* \*

"It was an *irrational* act. [responding to a question whether it was a voluntary act on his part by his own volition.]" [Emphasis supplied.]

In a letter [exhibit] dated January 12, 1972, Dr. Yates referred to Atkinson's death as "an unfortunate accident".

An exhaustive examination of the testimony in this case will not show whether Atkinson fell out of the window or jumped out to escape imaginary perils, or under the belief the window was on or near ground level. The attending physician speculated but was unwilling to say whether the decedent fell or jumped, and this court is in no better position to make such a judgment. The one thing that was established with complete certainty was that the decedent was not an insane person, did not intend to commit suicide, and was completely unaware of the peril or consequences of what he was doing. We should apply the same presumptions here that we have applied in previous cases, and that were recently applied in *Schleunes* v. *American Cas. Co. of Reading, Pa.*, 528 F.2d 634, 639 (5th Cir. 1976), where Circuit Judge Roney said:

> " 'The presumption against suicide will stand and be decisive of the case until overcome by testimony which shall outweigh the presumption.'

\* \* \* \* \*

"Once plaintiff presented evidence showing external, violent death, under circumstances leaving suicide in doubt, the state's presumption against suicide required defendant to overcome the presumption by establishing suicide to the exclusion of every other reasonable hypothesis. . . ."

I would further add that I regard the rule articulated in the *Christensen* decision as the sounder one. The language "self-destruction or self-inflicted injury, while sane or insane", and exclusions similarly expressed, have spawned a great volume of litigation. The reason is that the language is ambiguous. It is not so precise as to exclude both suicide which is knowingly attempted and suicide which is done under a delusionary state.

The majority opinion holds: "The plain language of the exclusionary clause comprehends all purposeful self-destruction whether the suicidal act shall emanate from a sane person or one suffering from a mental aberration." Among the cases cited and relied on in the opinion is *Johnson* v. *Metropolitan Life Ins. Co.*, 404 F.2d 1202 (3rd Cir. 1968). The court there, constructing the clause "suicide while sane or insane", said:

> "[O]n its face that language plainly comprehends all purposeful self destruction, whether the suicidal intent and conduct shall emanate from a sane mind or a deranged one."

In *Johnson*, an insured, beset with marital difficulties, and under a court order to stay away from his wife, violated that order, went to his home, spread fuel oil around a room and on his clothing and set fire to the premises and to his clothing. He left two notes to his wife written in crayon and lipstick, which were found at the scene of his death. He died of resulting burns. The court found there was no evidence that Johnson did not know what he was doing, and no allegation or contention which could support a reasonable conclusion that the decedent was unaware of the fatal consequences of his act. The court upheld the summary judgment of the district court. Significantly, it equated "purposeful" with "intentional" and observed:

> "It follows that summary judgment was improper in the present case *only* if the record established *a disputable issue of fact* whether the insured, in his admitted derangement, was attempting to take his life when he immolated himself. Of course a deranged person can believe that he is immortal, or that fuel oil is water, or, on some other irrational basis, that saturating his clothes with fuel oil and applying a lighted match will not kill him. *Or his mental disorder may be so extreme that he has no comprehension whatever of what he is doing. Any such showing would negate intentional self destruction.*" 404 F.2d at 1204. [Italics supplied.]

In the *Johnson* opinion, as in the majority opinion, the key word is "purposeful". "Purposely" means "intentionally, designedly, consciously, knowingly". Black's Law Dictionary 1400 (4th ed. 1951). Webster's Third New International Dictionary 1847 (1966), defines "purposeful" to mean "full of determination; guided by a definite aim; not aimless or meaningless". "Volition" is described in Webster's, p. 2563, as "the act of willing or choosing; the act of deciding; the exercise of the will". While the court found evidence that Johnson did act purposely and was aware of the fatal consequences of his act, there is not a scintilla of evidence that Atkinson acted intentionally, designedly, consciously or knowingly. The evidence is to the contrary. We only know that a physically ill man, under the delusion that his life was in peril, was missed from his eighth floor hospital room and was thereafter found dead of injuries obviously received from a fall.

The Court, in the case under review, has in effect added the word "purposeful" as a prefix to the word "self-destruction" in the policy's exclusionary clause. It is to this action that I take exception. If it be the intent of an insurance company to deny liability where an insured is killed or sustains bodily injuries as a result of suicide or of self-inflicted injuries, while sane or insane, and whether such injuries are inflicted consciously or intentionally, this should be clearly stated in its policy. Applying the holding of the majority, and under the exclusionary clause as here construed, could a somnambulist recover for a self-inflicted injury received while walking in his sleep? Could a hospital patient, heavily sedated with drugs and under their influence, who gets out of bed and jumps down the stairwell, recover? And what would be the status of a policyholder who inflicts injury to himself while partially under the influence of anesthesia or hypnosis?

I would reverse and enter final judgment for appellant.